**Alejandro V. SANTACRUZ, Appellant**

v.

**The STATE of Texas, Appellee.**

**No. 14–05–00227–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 27, 2007.

Kim A. Parks, Houston, for Appellant.

Kevin P. Keating, Houston, for State.

Panel consists of Justices ANDERSON, FROST, and EDELMAN.*

### MAJORITY OPINION ON REHEARING

KEM THOMPSON FROST, Justice.

The State's motion for rehearing is granted. The court's unanimous memo-randum opinion issued on August 31, 2006 is withdrawn, and this Majority Opinion on Rehearing is issued in its place.

Appellant challenges his conviction for aggravated assault, asserting in multiple issues that the evidence is legally and fac-tually insufficient to support the conviction and that the trial court erred in admitting evidence in violation of the Confrontation Clause. We conclude that the evidence is legally and factually sufficient and that appellant failed to preserve error as to his first Confrontation Clause issue. As to appellant's second Confrontation Clause is-sue, we conclude that statements made in and recorded during a 9-1-1 call were nontestimonial and therefore the trial court's admission of the audiotape of the call did not offend the Confrontation Clause.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Around 10:30 p.m. on May 4, 2004, the complainant Nelly Canales called 9-1-1 and requested that an ambulance and po-lice be sent to her location. When asked why an ambulance was needed, Canales stated that her husband had hit her in the mouth. When asked if she had been sexu-ally assaulted, she stated that her husband had hit her with his rifle. Canales later stated that this incident had occurred at her house about ten to fifteen minutes earlier and that she had taken her children to her mother's house, and had placed the 9-1-1 call from there. Officer Ferguson, the responding officer, arrived within min-utes after the 9-1-1 call and found Canales in an ambulance. Officer Ferguson noted that Canales had obvious trauma to her mouth, injuries to her face, and she was extremely upset, crying, and shaking. Of-ficer Ferguson recounted that Canales told him she had been assaulted by her hus-band, and named appellant as her hus-

* Senior Justice Richard H. Edelman sitting by assignment.

band. Canales told Officer Ferguson that her four-year-old daughter had let her husband and brother-in-law into the house. Canales further informed Officer Ferguson that she and appellant had recently separated, and he was very upset. Canales explained that, after entering the house, appellant struck her repeatedly in the face. Canales stated she was afraid that appellant was going to come back and assault her again. The exchange between Canales and Officer Ferguson lasted approximately fifteen minutes. The day after the incident officer Michael Rone interviewed Canales at the police station. Officer Rone stated that Canales's injuries were consistent with having been struck with a blunt object.

Appellant was later apprehended, and charged by indictment with the offense of aggravated assault. The indictment alleged that appellant used a deadly weapon, specifically a rifle, in the course of committing an assault. Appellant pleaded "not guilty." The jury found him guilty as charged, and the trial court sentenced appellant to two years' confinement in the Institutional Division of the Texas Department of Criminal Justice.

## II. Issues Presented

Appellant presents the following three issues for our review:

(1) The trial court erred in admitting the hearsay statements of Canales, through the testimony of Officer Ferguson, in violation of the Confrontation Clause of the Sixth Amendment of the United States Constitution (herein "Confrontation Clause") and in violation of the Texas Constitution.

(2) The trial court erred in admitting the audiotape of the 9–1–1 call in violation of the Confrontation Clause and in violation of the Texas Constitution.

(3) The evidence is legally and factually insufficient to support appellant's conviction for aggravated assault.

## IV. Analysis

### A. Is the evidence legally and factually sufficient to support appellant's conviction for aggravated assault?

 In his third issue, appellant asserts the evidence is legally and factually insufficient to support his conviction for aggravated assault. A person commits assault if he intentionally, knowingly, or recklessly causes bodily injury to another. Tex. Penal Code Ann. § 22.01 (Vernon Supp.2006). The offense becomes aggravated assault if the person committing assault uses a deadly weapon during the commission of the assault. Tex. Penal Code Ann. § 22.02.

 In evaluating a legal-sufficiency challenge, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex.Crim.App. 2000). The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State,* 667 S.W.2d 137, 143 (Tex.Crim.App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State,* 819 S.W.2d 839, 846 (Tex.Crim. App.1991). The jury, as the trier of fact, "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State,* 991 S.W.2d 267, 271 (Tex.Crim.App.1999). The jury may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App. 1986). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the prevailing party. *Turro v. State,* 867 S.W.2d 43, 47 (Tex.Crim.App.1993). Therefore, if any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim.App.1997).

 In contrast, when evaluating a challenge to the factual sufficiency of the evidence, we view all the evidence in a neutral light and inquire whether we are able to say, with some objective basis in the record, that a conviction is "clearly wrong" or "manifestly unjust" because the great weight and preponderance of the evidence contradicts the jury's verdict. *Watson v. State*, 204 S.W.3d 404, 414–17 (Tex.Crim.App.2006). It is not enough that this court harbor a subjective level of reasonable doubt to overturn a conviction that is founded on legally sufficient evidence, and this court cannot declare that a conflict in the evidence justifies a new trial simply because it disagrees with the jury's resolution of that conflict. *Id.* at 417. If this court determines the evidence is factually insufficient, it must explain in exactly what way it perceives the conflicting evidence greatly to preponderate against conviction. *Id.* at 414–17. Our evaluation should not intrude upon the fact finder's role as the sole judge of the weight and credibility given to any witness's testimony. *See Fuentes*, 991 S.W.2d at 271. In conducting a factual-sufficiency review, we discuss the evidence appellant claims is most important in allegedly undermining the jury's verdict. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App.2003).

The evidence is undisputed that appellant struck his wife—Canales—and caused her injuries. Appellant, however, disputes that this contact occurred with a rifle in addition to his fist. The record contains Canales's own statements that appellant struck her with a rifle as well as Officer Rone's testimony that Canales's injuries were consistent with being struck with a blunt object. Apart from appellant's and his sister's testimony that appellant struck

Canales with his hand and not a rifle, none of the evidence supports appellant's version of events. The jury, being the sole judge of the facts and credibility of the witnesses, could choose to believe or not believe the witnesses at all, or choose to believe or not believe any portion of their testimony. *Rojas v. State*, 171 S.W.3d 442, 445–46 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd). Based on the evidence adduced at trial, a rational trier of fact could conclude, beyond a reasonable doubt, that appellant assaulted Canales and used a deadly weapon during the commission of the assault. *See Zimmerman v. State*, 754 S.W.2d 402, 405 (Tex.App.-Corpus Christi 1988, pet. ref'd). We conclude, after reviewing the evidence in a neutral light, that the verdict is not against the great weight and preponderance of the evidence and is not clearly wrong or unjust. *See Watson*, 204 S.W.3d at 414–17. Accordingly, the evidence is legally and factually sufficient to support appellant's conviction, and we overrule appellant's third issue.

**B. Did appellant preserve error as to his first Confrontation Clause issue?**

 In his first issue, appellant argues that the trial court violated his right to confrontation by admitting into evidence Canales's hearsay statements through the testimony of Officer Ferguson. During this testimony, appellant's counsel either did not object or he asserted reasons other than the Confrontation Clause or the Texas Constitution for excluding the evidence, such as the nonresponsiveness of the answer, hearsay, "leading question," and "narrative answer." Appellant never objected to the admission of this evidence based on any alleged violation of the Confrontation Clause or of the Texas Constitution. Therefore, appellant failed to preserve error. *See Reyna v. State*, 168 S.W.3d 173, 177–79 (Tex.Crim.App.2005).

Accordingly, we overrule appellant's first issue.

## C. Did the admission of the 9–1–1 tape violate the Confrontation Clause or Article, section 10 of the Texas Constitution?

In his second issue, appellant asserts that the trial court erred in admitting an audiotape of Canales's 9–1–1 call over his objection that admission of this evidence violated his rights under the Confrontation Clause and under Article 1, section 10 of the Texas Constitution. On appeal, appellant provides no argument or authorities with respect to the protection provided by the Texas Constitution. Based on this inadequate briefing, we overrule the second issue as to appellant's argument under the Texas Constitution. *See* Tex.R.App. P. 38.1(h); *Russeau v. State,* 171 S.W.3d 871, 881 (Tex.Crim.App.2005).

■■■ As to the alleged violation of the Confrontation Clause, in *Crawford,* the Supreme Court of the United States interpreted the Confrontation Clause to prohibit a witness from recounting a declarant's out-of-court statements that are testimonial unless (1) the declarant is unavailable to testify and (2) the defendant had a prior opportunity to cross-examine the declarant, regardless of whether the declarant's statements are deemed reliable by the court. *See Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). To determine whether the admission of the 9–1–1 tape violated the Confrontation Clause, we must determine whether the statements on the tape are testimonial. The Supreme Court recently explained the distinction between testimonial and nontestimonial statements:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington,* —— U.S. ——, ——, 126 S.Ct. 2266, 2273–74, 165 L.Ed.2d 224 (2006).

The *Davis* court addressed whether statements made by a victim of domestic violence to a 9–1–1 operator[1] were testimonial in nature. *See id.,* 126 S.Ct. at 2276–77. In concluding that the caller's statements were nontestimonial and thus admissible, the *Davis* court looked to the following factors: (1) the caller was describing events as they were actually happening rather than past events; (2) any reasonable listener would recognize that the caller was facing an ongoing emergency; (3) when viewed objectively, the nature of what was asked and answered was such that the elicited statements were necessary to resolve the present emergency, rather than simply to learn what had happened in the past; and (4) the caller was frantically answering the 9–1–1 emergency operator's questions over the phone, in an environment that was not tranquil, or even safe. *See id.* The *Davis* court concluded

---

1. As the *Davis* court did, we presume without deciding that the acts of 9–1–1 operators may be considered to be acts of the police. *See Davis,* 126 S.Ct. at 2274, n. 2.

that the caller was "seeking aid, not telling a story about the past." *See id.,* 126 S.Ct. at 2279.

The Supreme Court also observed that "initial inquiries" by law enforcement officers arriving at crime scenes involving domestic disputes "may often" produce non-testimonial statements because "officers called to investigate ... need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Id.* Such statements may be nontestimonial if they constitute "a cry for help" or "the provision of information enabling officers to end a threatening situation." *See id.*

With these principles in mind, we now examine the statements contained in the 9–1–1 audiotape the trial court admitted into evidence. The playing time for this tape is slightly more than four minutes. At the beginning of the tape, Canales tells the operator that she wants an ambulance and the police sent to her mother's house. The initial operator then connects Canales to a second operator who identifies herself as "Houston Fire and Ambulance." This operator obtains the following information from Canales: (1) her location, (2) her name, and (3) her phone number. The following exchange then takes place:

[operator]: Why is an ambulance needed?
[Canales]: Because my husband hit me in the mouth with a _____ [inaudible] on my mouth.
[operator]: O.K. Are you breathing normally m'am?
[Canales]: Yes, m'am.
[operator]: Were you sexually assaulted?
[Canales]: My husband hit me. He grabbed me, and he hit me with his rifle.
[operator]: Is your husband still there?
[Canales]: No, he took off running with his brother-in-law.

The operator then reconfirmed Canales's location and asked in what kind of vehicle Canales's husband had left. Canales provided this information. The operator then asked if Canales was on any medications, and Canales answered that she was not. The operator then asked Canales if she was bleeding. Canales responded that she was bleeding "a lot," so the operator gave Canales instructions as to what to do while Canales waited for the ambulance to arrive. The operator asked the age and race of Canales's husband and what clothing he was wearing. After the operator sought to reconfirm that Canales's husband had left the location, Canales stated for the first time that her husband hit her at her house and that she then left that location and took her children to her mother's house. Canales said that this incident with her husband had occurred ten to fifteen minutes earlier. The operator stated, "And he had a rifle?" To which Canales responded, "Yes, he does." Finally, Canales gave the address at which she believed her husband could be located. From listening to the tape, it is clear that Canales was distraught, and at times she was breathing heavily.

As to the first consideration discussed by the *Davis* court, Canales was describing her current emergency situation and seeking help. However, as to the three sentences in which Canales refers to the offense in question, Canales was not describing events as they were actually happening; instead, she was describing events that had occurred ten to fifteen minutes earlier. Our dissenting colleague seems to indicate that, under *Davis,* a 9–1–1 caller must be describing a criminal offense as it is happening, with the perpetrator present, for the caller's statements to be nontestimonial. *See* 237 S.W.3d at pp. 831–32. The *Davis* court did not so hold; rather, it stated that this is only one factor to be considered in determining whether statements were made under circumstances ob-

jectively indicating that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency. *See id.,* 126 S.Ct. at 2273–77. Courts applying *Davis* have held statements to be nontestimonial even though they were not describing events as they were happening. *See, e.g., Martinez v. State,* 236 S.W.3d. 361, 365, 374–75 (Tex. App.-Fort Worth 2007, no pet. h.) (holding that statements made by appellant's son were nontestimonial under *Davis,* even though they described past events in which appellant gave son a bag to hide in his pants); *Garcia v. State,* 212 S.W.3d 877, 883–84 (Tex.App.-Austin 2006, no pet.) (holding that statements made by wife were nontestimonial under *Davis,* even though they described past events in which her husband had forcibly abducted his child in violation of a court order); *Delacueva v. State,* No. 14-05-01115-CR, 2006 WL 3589482, at *3 (Tex.App.-Houston [14th Dist.] Dec. 12, 2006, pet. ref'd) (not designated for publication) (holding that statements made by appellant's girlfriend were nontestimonial under *Davis,* even though they described past events in which boyfriend had "beat up" girlfriend).

As to the second factor, a review of the tape shows that any reasonable listener would recognize Canales was facing an ongoing emergency. She was injured and bleeding from the assault wounds to her mouth. She was in distress and was seeking medical attention for her injuries. Furthermore, before the State offered the tape into evidence, Officer Ferguson testified that when he arrived at Canales's mother's house, Canales was extremely upset. She was crying, shaking, and afraid that appellant was going to come back and assault her again. In addition to this subjective fear, the circumstances shown by the record objectively indicate there was a risk that appellant—a family member— would appear at Canales's mother's house. Appellant recently had been enraged with his estranged wife and brutally assaulted her at their nearby home. He then fled with his brother-in-law. Although Canales did leave her house to seek refuge in her mother's house, it is objectively reasonable to conclude there was a risk in this domestic context that appellant would appear at Canales's mother's house.

As to the third factor, the nature of what was asked and answered, when viewed objectively, was such that the elicited statements were necessary to effectively address the present emergency, rather than simply to learn what had happened in the past. After Canales sought the help of an ambulance and police, the 9-1-1 operator obtained important basic information regarding Canales's identity, location, and circumstances. The operator then asked why an ambulance was needed, and Canales stated that her husband hit her in the mouth. When asked if she had been sexually assaulted, Canales stated that her husband had hit her with a rifle. The operator asked whether her husband was still there. The operator also inquired whether Canales was on any medication, asked about the extent of her injuries, and gave Canales first-aid instructions to address her profuse bleeding. The operator asked Canales for some identifying information about her husband and reconfirmed that he was not at the location. The operator asked Canales how long ago the assault occurred and confirmed that appellant had a rifle. The operator's questions and Canales's answers were necessary to resolve both her medical emergency and the responding police officers' need to know "whom they are dealing with in order to assess the situation," the threat to their own safety, and possible danger to the potential victim. *Davis,* 126 S.Ct. at

2276–79; *see also Martinez*, 236 S.W.3d at 372–75.

As to the fourth factor, the tape shows that Canales was distraught and frantically answering the 9–1–1 operator's questions in an environment that was not tranquil. Furthermore, because of the risk that appellant might appear at her mother's house, the environment was not safe either.

In sum, Canales's statements on the 9–1–1 tape constitute "a cry for help" and "the provision of information enabling officers to end a threatening situation." *See Davis*, 126 S.Ct. at 2279. Canales made these statements under circumstances objectively indicating that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency. The circumstances do not objectively indicate that the primary purpose of the interrogation was to establish or prove past events potentially relevant to later criminal prosecution. *See id.* We conclude that Canales's statements on the tape were nontestimonial.[2] *See id.*, 126 S.Ct. at 2276–79; *Martinez*, 236 S.W.3d at 372–75; *Garcia*, 212 S.W.3d at 883–84; *see also Delacueva*, 2006 WL 3589482, at *3. Therefore, the trial court's admission of this tape did not violate appellant's rights under the Confrontation Clause. Accordingly, we overrule appellant's second issue as to the argument under the Confrontation Clause.

Having overruled all of appellant's issues, we affirm the trial court's judgment.

EDELMAN, J., dissents.

RICHARD H. EDELMAN, Justice, dissenting.

I disagree with the Majority Opinion's conclusion that the complainant's statements on the 911 tape (the "tape") identifying appellant as her assailant were nontestimonial.[1]

In *Davis*, the Supreme Court described the difference between testimonial statements, that are barred by the Confrontation Clause, and nontestimonial statements, that are not:

> Statements are nontestimonial when made in the course of police interrogation [2] under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, —— U.S. ——, 126 S.Ct. 2266, 2273–74, 165 L.Ed.2d 224 (2006).

---

2. Our dissenting colleague states that the testimonial nature of Canales's statements is further demonstrated by her subsequent statement to a responding officer that appellant's brother-in-law had struck her with the rifle and that appellant had hit her with his fists. *See* 237 S.W.3d at 832, n. 3. However, our esteemed colleague has not cited, and research has not revealed, cases holding that a statement's reliability or veracity is a factor in determining whether it is testimonial.

1. Although evidentiary rulings are generally reviewed for abuse of discretion, we apply a *de novo* standard of review when reviewing whether admission of evidence is a Confron-

tation Clause violation. *See Wall v. State*, 184 S.W.3d 730, 742 (Tex.Crim.App.2006).

2. Although this passage refers to police interrogation, the footnotes in *Davis* clarify that: (1) this is not to imply that statements made in the absence of any interrogation are necessarily nontestimonial; and (2) 911 operators who are not themselves law enforcement officers may nevertheless be the agents of law enforcement when they interrogate 911 callers and would be considered as such for purposes of that opinion. *See Davis v. Washington*, —— U.S. ——, ——, 126 S.Ct. 2266, 2274 n. 1, 2, 165 L.Ed.2d 224 (2006).

In then illustrating this distinction by contrasting McCottry's statements in *Davis,* that were not testimonial, from Crawford's statements in *Crawford,* that were testimonial, the Court explained:

> [T]he initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance.
>
> * * * *
>
> In *Davis,* McCottry was speaking about events *as they were actually happening,* rather than "describ[ing] past events," Sylvia Crawford's interrogation, on the other hand, took place hours after the events she described had occurred. Moreover, any reasonable listener would recognize that McCottry (unlike Sylvia Crawford) was facing an ongoing emergency. Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, McCottry's call was plainly a call for help against bona fide physical threat. Third, the nature of what was asked and answered in *Davis,* again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. And finally, the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.

We conclude from all this that the circumstances of McCottry's interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. She simply was not acting as a *witness;* she was not *testifying.* What she said was not "a weaker substitute for live testimony" at trial, like ... Sylvia Crawford's statement in *Crawford.* In each of those cases, the *ex parte* actors and the evidentiary products of the *ex parte* communication aligned perfectly with their courtroom analogues. McCottry's emergency statement does not. No "witness" goes into court to proclaim an emergency and seek help.

* * * *

This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot ... "evolve into testimonial statements" ... once that purpose has been achieved. In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises).

*Id.* at 2276–77 (citations omitted).

If the testimonial nature of statements in a 911 call is to be determined from the viewpoint of the 911 operator, as some portions of the foregoing excerpt could suggest, then the beginning of every 911 call would necessarily be nontestimonial at least until the extent and urgency of the emergency, if any, is determined. However, the opinion also states that "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." *Id.* at 2274 n. 1. Moreover, other portions of the above *Davis* excerpt emphasize that: (1) the crucial Confrontation

Clause distinction between testimonial and nontestimonial statements is whether they were given for the purpose of establishing past facts; and, thus, (2) the actual existence of a bona fide emergency is essential to assure that the caller is, in fact, describing current circumstances that require immediate police assistance so as not to be acting as a witness concerning past facts.

In this case, the 911 call was not placed from the location where the assault had occurred, or while it was happening. Rather, the call was made some ten to fifteen minutes after the assault from the home of the complainant's mother, where the complainant had since taken her children. Although it is clear that the complainant was injured and still very upset, there is no indication in the recording[3] that appellant remained an ongoing threat such as by: (1) having attempted to prevent the complainant from leaving their home, where the assault had occurred; (2) having pursued her when she left there; (3) being present at the home from which the call was made; or (4) even being aware that the complainant had gone there, such that his identification was needed, as in *Davis*, to enable the dispatched officers to know whether they would be encountering a violent felon when they arrived. *See id.* at 2276. The complainant was therefore in need of medical attention for a past threat, rather than seeking help against a present threat or other ongoing emergency requiring police assistance. The 911 tape in this case is thus like the portion of the tape in *Davis* that had evolved into testimonial statements because "the emergency appears to have ended (when Davis drove away from the premises)."

Because the statements on the tape are testimonial, their admission is constitutional error, which requires reversal unless we determine beyond a reasonable doubt that it did not contribute to the judgment.[4] However, because the complainant's statements on the tape provided the only direct evidence of the aggravating element of the offense, *i.e.*, that appellant had assaulted her with a deadly weapon, there is no basis to conclude beyond a reasonable doubt that the error did not contribute to appellant's conviction. Therefore, we should sustain appellant's second issue, reverse his conviction, and remand the case to the trial court.

---

**3.** Nothing in *Davis* suggests that the testimonial or nontestimonial character of a statement in a 911 tape can be determined in hindsight by reference to events occurring after the 911 conversation takes place, as the Majority attempts to do by reference to the complainant's statements to responding officers. Regardless, it was appellant who had first left the scene of the assault, and the evidence relied upon by the Majority suggests, at most, a possibility of a future threat rather than a likelihood of any immediate threat. If anything, the complainant's statement to a responding officer, that it was her brother-in-law who had struck her with the rifle, and that appellant had struck her with his fist, underscores the need to not only test the complainant's credibility with cross-examination, but also to allow the jury to assess her demeanor in person.

**4.** Tex.R.App. P. 44.2(a); *see also Simpson v. State,* 119 S.W.3d 262, 269–71 (Tex.Crim.App. 2003) (analyzing a confrontation clause violation under the constitutional harm framework established in Rule of Appellate Procedure 44.2(a)).