

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00271-CR
_____

SERGIO ALEJANDRO AGUILAR, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1751244R

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

Appellant Sergio Alejandro Aguilar appeals his jury-trial convictions for assault on a family member with a previous family-violence conviction (Count Three) and continuous violence against the family (Count Four).[1] *See* Tex. Penal Code Ann. §§ 22.01(b)(2)(A), 25.11(a). On appeal, Aguilar argues in four points that (1) his convictions on both Counts Three and Four violate the double-jeopardy protections contained in Penal Code Section 25.11(c); (2) the trial court erred by admitting State's Exhibit 3, a recording of two 911 calls, in violation of Aguilar's Sixth Amendment Confrontation Clause rights; (3) the evidence is insufficient to show that Aguilar assaulted the complainant on March 13, 2022, as alleged in Count Four; and (4) the cumulative effect of the complained-of errors is such that Aguilar should be acquitted of both counts. For the reasons set forth below, we sustain Aguilar's first point,[2] reverse the trial court's judgment of conviction on Count Three, and render judgment of acquittal on that count. But we overrule Aguilar's remaining points and affirm his conviction on Count Four.

---

[1]Aguilar was also charged with two counts of aggravated assault with a deadly weapon (Counts One and Two), but he was found not guilty of these charges.

[2]As discussed more fully below, the State concedes that the two convictions on Counts Three and Four violate double jeopardy and that one must be vacated.

## I. BACKGROUND

Aguilar was charged by indictment with four offenses. The indictment alleged that Aguilar assaulted his girlfriend, "Renee,"[3] on three separate occasions: April 28, 2021; May 6, 2021; and March 13, 2022. Count Three is based on the April 28, 2021 assault,[4] and the three assaults collectively constitute the predicate offenses underpinning Count Four.

Renee was in the Tarrant County Jail at the time of trial and did not testify. But, as detailed below, the State introduced witness testimony, recordings of 911 calls, police body-camera video, surveillance video, and medical records to establish that Aguilar had committed the alleged assaults.

### A. The April 28, 2021 Assault

Yuliana Lopez testified that on April 28, 2021, she was at home with her mother and her children when a woman, who was later identified as Renee,[5] knocked on her door asking for help.[6] Renee was crying and shaking and looked scared.

---

[3]To protect the privacy of the complainant, we refer to her by a pseudonym.

[4]Aguilar stipulated, as alleged in Count Three, that he had previously been convicted of assault with bodily injury against a member of his family or household or with whom he had a dating relationship.

[5]Lopez testified that she did not know Renee and "had never seen her before" April 28, 2021.

[6]At trial, Aguilar objected to Lopez's testimony on the grounds that it contained hearsay and violated his Confrontation Clause rights and received a running objection, but he does not complain about Lopez's testimony on appeal.

Renee told Lopez that she needed help because her boyfriend was trying to beat and kill her. Renee told Lopez that her vehicle was at the house from which she had escaped—Aguilar's house, which is several houses down from Lopez's residence—but she did not have the keys. Renee also stated that she did not have her phone with her.[7]

Lopez explained that she did not allow Renee inside her house out of concern for her children because Renee "made [her] scared" and had been "saying that someone was trying to kill her." But she continued to talk to Renee on her front porch and, at one point, went inside to get her phone so that Renee could call 911. Once Lopez returned to the porch with her phone, Renee asked her to call 911 on her behalf because she could barely speak.

Lopez called 911 and spoke to the operator first. During the call, which was initiated approximately five minutes after Renee arrived at Lopez's house, Lopez described Renee as "crying [and] really scared" and explained that Renee was hiding at her house because her boyfriend was trying to beat her. Renee relayed her address to the 911 operator through Lopez and then spoke with the 911 operator herself.

After the 911 operator calmed her down, Renee identified Aguilar as her attacker and provided his age and date of birth. She also described Aguilar's clothing and told the operator that he had brass knuckles and was still at his address. She also

---

[7]Later, while talking to the 911 operator, Renee explained that Aguilar had taken her phone when she had tried to call the police.

confirmed that she was at her neighbor's house, not Aguilar's, and explained that she did not have her phone because Aguilar had taken it when she had tried to call the police.

Because the police had not arrived after about thirty minutes, Renee asked Lopez to call 911 again, and she complied. When asked why she made the second call, Lopez explained that she did so "because [Renee] was shaking more . . . [a]nd it was making [Lopez] scared." According to Lopez, "[Renee] was more freaked out, like any little noise and she was freaking out," and she "kept saying, [']I want to go. I want to go. They need to come. They need to come.[']" Given Renee's "freaked out" state, Lopez acquiesced to her request to call 911 again because she did not know what else to do.

During the second call, only Lopez spoke to the 911 operator. She expressed that (1) she and Renee had called earlier, but the police had not yet arrived; (2) "the guy" was still a few houses down the street; and (3) Renee was hiding at her house. Lopez reiterated that Renee was really nervous because "she [did] not want [Aguilar] to come out and look for her" and told the operator that Renee was really scared, could not stop shaking, and was covered in bruises. Lopez also conveyed that Renee had said that Aguilar had told her that he wanted to kill her, that they were outside, and that she felt that they were all in danger.

5

Officer Taylor Hazelwood was one of the police officers who responded to the call.[8] He testified that Renee appeared visibly scared; her voice was quivering; and she kept looking around. He also observed that she had bruises on her arms and back and behind her ear. Renee identified herself to him and confirmed that she lived at Aguilar's house with him. She told him that Aguilar had beaten her with his fists and a golf club, had held a knife to her throat, and had threatened her with brass knuckles.[9] According to Renee, this assaultive conduct began around 9:00 a.m. and continued until she was able to escape with the help of Aguilar's mother.

Because the officers were unable to locate Aguilar, he was not interrogated or taken into custody. Instead, the officers made an online report that was forwarded to a detective and took Renee to a safe location.

## B. The May 6, 2021 Assault

In the early morning hours of May 6, 2021, Renee, who was bleeding from her mouth and had her hands tied behind her back, woke up three residents whose houses are located near Aguilar's residence by knocking on their doors, ringing their doorbells, and begging for help. Each of them called 911, but Renee did not stay at any of the houses to wait for the police to arrive. Home surveillance videos of

---

[8]The video recorded from Officer Hazelwood's body camera during his response to the 911 call was admitted into evidence at trial.

[9]The trial court overruled Aguilar's hearsay objection to this testimony, but Aguilar does not complain about that ruling on appeal.

6

Renee's desperate attempts to get help were admitted into evidence and shown to the jury.

Police were dispatched to the area to investigate the residents' reports of a woman with a bloody face and her hands tied behind her back ringing doorbells. After a search, an officer found a woman sitting on the ground with her head down and her hands tied behind her back with ratchet straps.[10] The woman was "[v]ery afraid, crying, scared." Her face was bloody, and she had blood in her hair.

MedStar was contacted to send an ambulance to render aid to the woman, who identified herself as Renee. Through nonverbal communication,[11] Renee conveyed to MedStar personnel that she had been struck in the head, jaw, and legs with the perpetrator's fist, knees, and feet. Later at the hospital, Renee told a detective that Aguilar was the one who had injured her.

## C. The March 13, 2022 Assault

On March 13, 2022, Megan Arnold, who lived in an apartment complex near Aguilar's residence, heard a knock at her door, but she did not answer it because she was pregnant and did not recognize the woman knocking. Shortly thereafter, Arnold received a call from her boyfriend, who was in the parking lot of their apartment

---

[10]The officer's interaction with the woman was captured on his body camera, and this body-camera recording was admitted into evidence and viewed by the jury.

[11]Because of the nature and extent of Renee's injuries, including a broken jaw, she was unable to talk.

complex on his way to work. He told Arnold that a woman had asked to use his phone and that Arnold should help her because she seemed to be in trouble.

When Arnold found the woman, she was still knocking on doors in the breezeway of the next building over from Arnold's. She was crying hysterically and had dried blood on her lips. The woman told Arnold that her ex-boyfriend had held her captive for hours.

Arnold immediately called 911. At the 911 operator's request, Arnold took the woman into her apartment. After Arnold gave her some Excedrin and something to drink, the woman fell asleep in a recliner.

Officer Anita Simms responded to Arnold's 911 call. When she walked into Arnold's apartment, she found the woman, who was identified as Renee, asleep in the recliner. Officer Simms observed that Renee was "[v]ery, very, tiny" and "just mangled" with bruises and blood "everywhere." She seemed scared and disoriented. Due to the extent of Renee's injuries, Officer Simms called MedStar and requested medical assistance.

## D. Arrest and Trial

Near the end of March 2022, Officer Simms helped serve a warrant on Aguilar, whom she identified at trial. Aguilar resisted arrest but was ultimately subdued and taken into custody.

In October 2022, a jury convicted Aguilar of two of the offenses alleged in a four-count indictment: assault on a family member with a previous conviction, *see*

Tex. Penal Code Ann. § 22.01(b)(2)(A), and continuous violence against the family, *see id.* § 25.11(a), as alleged in Counts Three and Four. The jury assessed Aguilar's punishment at fifty years in prison for each offense. The trial court sentenced him accordingly and ordered that the sentences are to run concurrently. This appeal followed.

## II. DISCUSSION

## A. Double Jeopardy

In his first point, Aguilar argues that his convictions and separate punishments for Counts Three and Four violate the double-jeopardy protections contained in Penal Code Section 25.11(c). We agree.[12]

The Double Jeopardy Clause, contained within the Fifth Amendment and applicable to the states through the Fourteenth Amendment, protects an accused against a second prosecution for the same offense. U.S. Const. amends. V, XIV; *Littrell v. State*, 271 S.W.3d 273, 275 (Tex. Crim. App. 2008). In addition to protecting against multiple prosecutions, this provision also protects against multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221,

---

[12]Generally, to preserve the error for appellate review, a defendant must raise a double-jeopardy claim in the trial court. *Gonzalez v. State*, 8 S.W.3d 640, 643–46 (Tex. Crim. App. 2000). Aguilar failed to do so, but this is not fatal to his double-jeopardy claim. Such a claim "may be raised for the first time on appeal when (1) the undisputed facts show the double-jeopardy violation is clearly apparent from the face of the record, and (2) enforcement of the usual rules of procedural default serves no legitimate state interest." *Garfias v. State*, 424 S.W.3d 54, 57–58 (Tex. Crim. App. 2014). We agree with the parties that both prongs of this test have been satisfied in the present case.

2225 (1977); *Ex parte Adams*, 586 S.W.3d 1, 4 (Tex. Crim. App. 2019); *Speights v. State*, 464 S.W.3d 719, 722 (Tex. Crim. App. 2015).

In a multiple-punishments double-jeopardy case, the relevant inquiry is always whether the legislature intended to permit multiple punishments. *Loving v. State*, 401 S.W.3d 642, 646 (Tex. Crim. App. 2013). Thus, in such a case, we must assess whether an appellant has been "convicted of more offenses than the legislature intended." *Ex parte Milner*, 394 S.W.3d 502, 507 (Tex. Crim. App. 2013) (quoting *Ervin v. State*, 991 S.W.2d 804, 807 (Tex. Crim. App. 1999)); *see Ball v. United States*, 470 U.S. 856, 861, 105 S. Ct. 1668, 1671–72 (1985).

Penal Code Section 25.11, the continuous-violence-against-the-family statute, expressly provides that unless certain statutory conditions are met, "[a] defendant may not be convicted in the same criminal action of another offense the victim of which is an alleged victim of the [continuous-violence offense] and an element of which is any conduct that is alleged as an element of the [continuous-violence offense]." Tex. Penal Code Ann. § 25.11(c). By including this provision, "the legislature indicated its clear intent: a person cannot be convicted in the same criminal action of continuous violence against a victim and also be convicted of additional, discrete instances of bodily-injury assault against that same victim if those discrete assaults could have been charged as part of the continuous count." *Birdo v. State*, No. 02-22-00142-CR, 2023 WL 4630627, at *5 (Tex. App.—Fort Worth July 20, 2023, no pet.) (mem. op., not designated for publication) (first citing Tex. Penal Code Ann. § 25.11(c); then citing

*Ellison v. State*, 425 S.W.3d 637, 647 (Tex. App.—Houston [14th Dist.] 2014, no pet.); and then citing *Soliz v. State*, 353 S.W.3d 850, 851–52 (Tex. Crim. App. 2011)). However, "the State may charge the additional, discrete acts alternatively or as lesser-included offenses." *Id.* (citing Tex. Penal Code Ann. § 25.11(c)).

Here, Aguilar's continuous-violence count (Count Four) was predicated on three assaults against Renee, including the one that occurred on April 28, 2021. The same April 28, 2021 assault also formed the basis of the assault-on-a-family-member offense alleged in Count Three.[13] Thus, having been convicted—and punished—for both Counts Three and Four, Aguilar suffered a violation of his right against multiple punishments. *See* Tex. Penal Code Ann. 25.11(c); *Birdo*, 2023 WL 4630627, at *5.

The State concedes that the trial court's imposition of concurrent fifty-year sentences for Counts Three and Four violated Penal Code Section 25.11(c), but it disagrees with Aguilar regarding the appropriate remedy. Aguilar argues that we should vacate his conviction for Count Four, which he asserts is the conviction that subjected him to double jeopardy. However, the State contends that Aguilar's case should be remanded to the trial court so that the State may elect which count should

---

[13]Counts Three and Four were not charged as alternatives, nor was Count Three submitted to the jury as a lesser-included offense of Count Four. *See* Tex. Penal Code Ann. § 25.11(c).

be vacated.[14]  Because we conclude that Count Four is the more serious offense, we will vacate Aguilar's Count Three conviction.

"The remedy for impermissible multiple convictions and punishments is to retain the most serious offense and vacate the other, the more serious offense ordinarily being defined as the offense for which the greatest sentence was assessed." *Littrell*, 271 S.W.3d at 279 n.34.  When the sentences are the same for both convictions, we may look to other distinguishing factors, such as the degree of each

---

[14]The State cites *Bien v. State*, 550 S.W.3d 180, 188–89 (Tex. Crim. App. 2018), in support of its contention that the case should be remanded so that the State can elect the count to be vacated.  However, *Bien* does not require remand and is distinguishable from the present case.  In *Bien*, the Court of Criminal Appeals, facing a situation in which no tiebreaker could resolve the question of which offense was more serious in the double-jeopardy context, elected to defer to the State's discretion and retain the conviction that it had requested. *Id.* at 189.  However, the court recognized the existence of other tiebreakers used by courts in such situations and did not proscribe their use. *See id.* at 188–89.  Significantly, in *Bien*—unlike the present case— the State had informed the Court of Criminal Appeals which offense it preferred to retain, meaning that remand was not required. *See id.* at 189.

If the State wanted to have a say as to which of Aguilar's two convictions is vacated, it could have expressed its preference in its briefing.  However, the State's failure to avail itself of this opportunity does not provide sufficient grounds for remanding this case rather than rendering judgment. *See* Tex. R. App. P. 43.3; *see also Bigon v. State*, 252 S.W.3d 360, 372 (Tex. Crim. App. 2008) (holding that when a multiple-punishment double-jeopardy violation occurs, "the remedy is to affirm the conviction for the most serious offense and vacate the other convictions"); *cf. Ash v. State*, 533 S.W.3d 878, 886 (Tex. Crim. App. 2017) (rejecting appellant's request to remand matter because the Court of Criminal Appeals could decide the issue and thereby "conserve scarce judicial resources"); *Beedy v. State*, 250 S.W.3d 107, 114 (Tex. Crim. App. 2008) (noting that decision to allow appellate courts to reform a judgment to remove an unlawful cumulation order rather than remanding for a new sentencing hearing was "reinforced" by the court's "interest in fostering judicial economy and conserving scarce judicial resources").

offense or an affirmative deadly weapon finding.  *Bigon*, 252 S.W.3d at 373 (degree of felony); *Villanueva v. State*, 227 S.W.3d 744, 749 (Tex. Crim. App. 2007) (affirmative deadly weapon finding).

Here, the punishments imposed for Counts Three and Four are identical:  for each offense, Aguilar was sentenced to fifty years in prison; no fines were assessed; and no restitution was ordered.  Further, both offenses are third-degree felonies, and neither included a deadly weapon finding.

But, as noted above, a discrete act of bodily-injury assault—as alleged in Count Three—may be charged as a lesser-included offense of a continuous-violence offense such as Count Four.  *Birdo*, 2023 WL 4630627, at *5 (citing Tex. Penal Code Ann. § 25.11(c)).  Given that characterization, we conclude that Aguilar's conviction for continuous violence against the family as alleged in Count Four is the more serious offense.  *See Weber v. State*, 536 S.W.3d 31, 37–38 (Tex. App.—Austin 2017, pet. ref'd) (concluding that appellant's continuous-sexual-abuse conviction was a more serious offense than his discrete aggravated-sexual-assault convictions despite the offenses' identical sentences because the individual acts of abuse are lesser-included offenses of the greater offense of continuous sexual abuse (citing *Carmichael v. State*, 505 S.W.3d 95, 101 (Tex. App.—San Antonio 2016, pet. ref'd))).  Accordingly, the proper remedy is to vacate Aguilar's Count Three conviction and to uphold his Count Four continuous-violence conviction.

In light of the foregoing, we sustain Aguilar's first point and render a judgment of acquittal on Count Three.

## B. Admission of State's Exhibit 3

In his second point, Aguilar argues that the trial court erred by admitting State's Exhibit 3, a recording of the two 911 calls Lopez initiated on Renee's behalf after the April 28, 2021 assault. Specifically, Aguilar contends that because Exhibit 3 contains testimonial hearsay, its admission violated the Sixth Amendment's Confrontation Clause. We disagree.

### 1. Standard of Review

Generally, a trial court's decision to admit evidence is reviewed under an abuse-of-discretion standard. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006). However, if the admission of evidence involves a constitutional legal ruling, such as whether a statement is testimonial or nontestimonial, the appellate court gives almost total deference to the trial court's determination of historical facts but reviews de novo the trial court's application of the law to those facts. *See Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010); *Wall*, 184 S.W.3d at 742 (applying hybrid standard of review to issue of whether statement was testimonial).

### 2. Applicable Law

The Sixth Amendment's Confrontation Clause, applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford v.*

*Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 1357, 1359 (2004); *Langham*, 305 S.W.3d at 575 (citing U.S. Const. amend. VI). "[T]he most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 1155 (2011). Once a defendant raises a Confrontation Clause objection, the burden shifts to the State to prove either (1) that the proposed statement does not contain testimonial hearsay and thus does not implicate the Confrontation Clause or (2) that the statement does contain testimonial hearsay but is nevertheless admissible. *See De La Paz v. State*, 273 S.W.3d 671, 680–81 (Tex. Crim. App. 2008) (citing *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374).

To determine whether the admission of the recording of the 911 calls violated the Confrontation Clause, we must first determine whether the statements on the recordings are testimonial. In *Davis v. Washington*, the United States Supreme Court explained the distinction between testimonial and nontestimonial statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency[] and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 822, 126 S. Ct. 2266, 2273–74 (2006). A court considers the totality of the circumstances in determining whether a statement is testimonial. *Clark v. State*, 282 S.W.3d 924, 931 (Tex. App.—Beaumont 2009, pet. ref'd).

"Statements made to police during contact initiated by a witness at the beginning of an investigation are generally not considered testimonial." *Cook v. State*, 199 S.W.3d 495, 498 (Tex. App.—Houston [1st Dist.] 2006, no pet.). For this reason, 911 calls initiated to summon police assistance are generally nontestimonial because they are "a cry for help" or "the provision of information enabling officers to end a threatening situation." *Davis*, 547 U.S. at 832, 126 S. Ct. at 2279; *Cook*, 199 S.W.3d at 498; *see also Rodgers v. State*, No. 09-09-00359-CR, 2010 WL 3043705, at *2 (Tex. App.—Beaumont Aug. 4, 2010, no pet.) (mem. op., not designated for publication) (listing cases in which courts concluded that similar 911 calls were nontestimonial). Similarly, responses to preliminary questions by police at the scene of a crime while police are assessing and securing the scene are not testimonial. *See Spencer v. State*, 162 S.W.3d 877, 882 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

In *Davis*, the Court addressed whether statements made by a victim of domestic violence to a 911 operator were testimonial in nature. *See* 547 U.S. at 826–27, 126 S. Ct. at 2276–77. In determining that the caller's statements were nontestimonial and thus admissible, the *Davis* court considered the following factors: (1) the caller was describing events as they were actually happening rather than past events; (2) any reasonable listener would recognize that the caller was facing an ongoing emergency;

16

(3) when viewed objectively, the nature of what was asked and answered was such that the elicited statements were necessary to resolve the present emergency, rather than simply to learn what had happened in the past; and (4) the caller was frantically answering the 911 emergency operator's questions over the phone in an environment that was not tranquil or even safe. *See id.* at 826–27, 126 S. Ct. at 2276–77. The *Davis* court concluded that the caller was "seeking aid, not telling a story about the past." *See id.* at 831, 126 S. Ct. at 2279.

In addition, the following principles are useful in determining whether particular statements are testimonial: (1) testimonial statements are official and formal in nature, (2) interaction with the police initiated by a witness or the victim is less likely to result in testimonial statements than if initiated by the police, (3) spontaneous statements to the police are not testimonial, and (4) responses to preliminary questions by police at the scene of the crime while police are assessing and securing the scene are not testimonial. *Amador v. State*, 376 S.W.3d 339, 342–43 (Tex. App.— Houston [14th Dist.] 2012, pet. ref'd).

With these considerations in mind, we now examine the complained-of statements in the 911 recording to determine whether they were testimonial.

### 3. Analysis

Here, the State carried its burden to show that the recording of the 911 calls did not contain testimonial hearsay.

17

With regard to the first *Davis* factor, although Renee was describing past events to the 911 operator, these events were in the immediate past and their description was necessary for the police to determine the type of emergency with which they were dealing. *See Guzman v. State*, No. 02-18-00332-CR, 2019 WL 2223213, at *3 (Tex. App.—Fort Worth May 23, 2019, no pet.) (mem. op., not designated for publication) (concluding that the first *Davis* factor weighed against the testimonial nature of a 911 caller's statements describing past events because the events described "were in the immediate past, and the caller's statements . . . were necessary for the police to form an idea about the type of emergency with which they were dealing" (citing *Hernandez v. State*, 562 S.W.3d 500, 506 (Tex. App.—Houston [1st Dist.] 2017), *vacated on other grounds*, No. PD-0036-19, 2020 WL 220021, at *1 (Tex. Crim. App. Jan. 15, 2020) (not designated for publication))); *Santacruz v. State*, 237 S.W.3d 822, 828 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (op. on reh'g) (concluding that domestic abuse victim's statements to 911 operator were nontestimonial even though they described events that had occurred ten to fifteen minutes earlier).

As to the second *Davis* factor, any reasonable listener would recognize that Renee and Lopez were facing an ongoing emergency. Renee had just escaped from Aguilar, and he had not yet been apprehended. Because Lopez was afraid to take Renee inside her house where her children were, they remained outside on Lopez's front porch only a few houses down from where Renee believed Aguilar to be. Renee's initial interactions with the 911 operator made it clear that she was afraid as

18

she frantically urged him to send help and had to be calmed down before she could answer the operator's questions. *See Duchesneau v. State*, Nos. 02-18-00321-CR, 02-18-00322-CR, 2019 WL 2455619, at *3 (Tex. App.—Fort Worth June 13, 2019, pet. ref'd) (mem. op., not designated for publication) (concluding that "any reasonable listener would recognize that [the 911 caller] was facing an ongoing emergency based on her initial plea for help and her screams"). Thus, the second *Davis* factor supports the conclusion that the statements were nontestimonial.[15]

With respect to the third *Davis* factor, the nature of what was asked and answered during the two calls—when viewed objectively—was such that the elicited statements were necessary to resolve the present emergency rather than simply to learn what had happened in the past. *See id.*; *Guzman*, 2019 WL 2223213, at *3. The information Renee and Lopez provided to the 911 operator—including identifying Aguilar as Renee's attacker; providing Aguilar's age and date of birth; describing his clothing; notifying the 911 operator that Aguilar had brass knuckles; confirming his

---

[15]Aguilar points to Lopez's statement during the second 911 call that "there is nothing going on right now" as evidence that Renee and Lopez were not facing an ongoing emergency. However, when the 911 operator initially asked Lopez if "anything [was] going on right now," Lopez responded, "No, but . . . [Renee's] afraid." And Lopez testified that the reason that she made the second 911 call was that Renee was "making [Lopez] scared" because she was "shaking more" and "freaking out." She also recalled that Renee "kept saying that he was coming, he was coming" and that "[h]e is coming for me [and] is going to hurt me." Thus, even though "nothing [was] going on" at the time of the second call in the sense that Aguilar was not currently trying to attack Renee, it is clear that Renee was afraid that Aguilar was coming for her; that both Renee and Lopez believed that they were facing an ongoing emergency; and that the purpose of the second 911 call was to seek aid. *See Davis*, 547 U.S. at 826–27, 126 S. Ct. at 2276–77.

19

location; and conveying that Aguilar had told Renee that he wanted to kill her, that Renee and Lopez were still outside, and that Lopez believed that they were in danger—was "necessary to resolve the responding officers' need for information about 'whom they [were] dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.'" *Guzman*, 2019 WL 2223213, at *3 (quoting *Hernandez*, 562 S.W.3d at 506)); *cf. Colbert v. State*, No. 03-17-00558-CR, 2019 WL 1065889, at *4 (Tex. App.—Austin Mar. 7, 2019, pet. ref'd) (mem. op., not designated for publication) (concluding that the questions asked by the 911 operator and the answers given by the caller were of the kind necessary to supply responding officers with the information needed to locate the victims, possibly apprehend the assailants, and respond appropriately to the potential threat to safety); *Dixon v. State*, 244 S.W.3d 472, 484–85 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (concluding that the primary purpose of the 911 operator's questions "was to determine if [complainant] was physically injured," if she needed medical assistance, and if there was "the potential for a continuing threat to [her] safety or the safety of the responding officer").

Concerning the fourth factor, as discussed above, Lopez expressed to the 911 operator that she felt that Renee and she were in danger. When Renee first spoke to the 911 operator, she pleaded over and over for him to hurry. The 911 operator had to calm Renee down before she could even answer his questions. Lopez described Renee as "crying [and] really scared," "freaked out," and unable to stop shaking.

20

Thus, Renee and Lopez clearly felt that they were "in an environment that was not tranquil, or even safe," *Davis*, 547 U.S. at 814, 126 S. Ct. at 2269, and this indicates that their statements were nontestimonial, *see Guzman*, 2019 WL 2223213, at *4 (determining caller's statements to 911 dispatcher were nontestimonial where the recording reflected "that the caller was scared; her voice was initially shaky and sounded as if she was out of breath, she then proceeded to breathe rapidly and heavily during the majority of the call, and she specifically stated that she was scared to go 'out there'"); *see also Hernandez v. State*, No. 01-16-00755-CR, 2020 WL 4210495, at *5 (Tex. App.—Houston [1st Dist.] July 23, 2020, no pet.) (mem. op., not designated for publication) (holding that caller's statements to 911 operator were nontestimonial because she "was upset, her voice was shaking, and she was breathing heavily").

Considering all of the *Davis* factors, we conclude that the complained-of statements in the 911 recording, when viewed objectively, were made informally under circumstances indicating that the interrogation's primary purpose was to enable the police to meet an ongoing emergency rather than to establish or prove past events potentially relevant to later criminal prosecution. *See Davis*, 547 U.S. at 822, 126 S. Ct. at 2273–74. Because the complained-of statements are nontestimonial, the trial court did not err by admitting State's Exhibit 3. *See Hernandez*, 2020 WL 4210495, at *5.

We overrule Aguilar's second point.

21

## C. Sufficiency of the Evidence Concerning the March 13, 2022 Assault

In his third point, Aguilar asserts that the evidence is legally insufficient to show that he assaulted Renee on March 13, 2022, as alleged in Count Four. However, because we overruled Aguilar's second point, his third point is moot.

Count Four of the indictment alleged that Aguilar committed three assaults, including the March 13, 2022 assault, but to convict Aguilar under Penal Code Section 25.11(a), the jury only had to find that Aguilar assaulted Renee at least twice within a twelve-month period. *See* Tex. Penal Code Ann. § 25.11(a). Aguilar did not challenge the sufficiency of the evidence to show that he committed the May 6, 2021 assault, and his evidentiary-sufficiency challenge regarding the April 28, 2021 assault was predicated on his second point—his contention that the trial court erred by admitting State's Exhibit 3. Because we overruled Aguilar's second point, Aguilar's argument regarding the sufficiency of the evidence of the April 28, 2021 assault fails. Therefore, regardless of whether we were to sustain Aguilar's third point, there is sufficient evidence to show that Aguilar assaulted Renee at least twice within a twelve-month period and, thus, to sustain his conviction on Count Four. *See id.*

Accordingly, we overrule Aguilar's third point as moot. *See* Tex. R. App. P. 47.1.

## D. Cumulative Error

In his fourth point, Aguilar contends that the cumulative effect of the trial court's errors is such that he must be acquitted of both Counts Three and Four. Having concluded that Aguilar's conviction on Count Three should be vacated on

double-jeopardy grounds, we overrule as moot his fourth point as it pertains to this count. *See id.* With respect to Count Four, Aguilar argues that his conviction should be reversed on evidentiary-insufficiency grounds. But, as noted above, his argument is premised on his second and third points. Having overruled Aguilar's second and third points, we likewise overrule the remainder of his fourth point.

### III. CONCLUSION

Having sustained Aguilar's first point and having overruled his remaining points, we reverse the trial court's judgment of conviction on Count Three and render judgment of acquittal on that count, but we affirm the trial court's judgment on Count Four.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 12, 2023