# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00717-CR

---

**Frank Estrada, III, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 299TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-24-904077, THE HONORABLE KAREN SAGE, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Frank Estrada, III was charged with violating the terms of a protective order twice within a twelve-month period; with assaulting Sylvia Loera, who was a member of his household or someone with whom he had a dating relationship; and with assaulting Loera with a deadly weapon. *See* Tex. Penal Code §§ 22.01, .02, 25.072. During their deliberations, the jury informed the trial court that they had come to a decision regarding the first count but were deadlocked for the remaining two. The trial court declared a mistrial for the second and third charges, and the State later dismissed those counts. The jury found Estrada guilty of the first charge. Estrada elected to have the trial court assess his punishment, and the trial court sentenced him to six years' imprisonment. *See id.* § 12.34. In four issues on appeal, Estrada contends that the trial court erred by admitting a recording of Loera's 911 call and medical

records from Emergency Medical Services ("EMS") and by granting the State's challenge for cause to Juror 53. We will affirm the trial court's judgment of conviction.

**BACKGROUND**

Estrada and Loera married one another after becoming romantically involved, and the couple lived in Loera's condo near the lake in Austin, Texas. On November 30, 2022, a trial court issued an agreed final protective order determining that Estrada had committed family violence and prohibiting him from, among other things, communicating with Loera and going within 200 yards of her or her residence. The order specified that it was effective until November 30, 2024, and included several warnings, including one stating that no one other than a court could grant Estrada permission to ignore the terms of the order. The order contained electronic signatures from Estrada, his attorney, and Loera's attorney and reflected that Estrada agreed to the terms. After the protective order was issued, Estrada and Loera got divorced in January 2023.

In April 2023, Estrada and Loera went to Cabo San Lucas to celebrate his birthday. When they returned to Austin on April 18, a customs employee notified the police department that Estrada and Loera were travelling together even though there was an active protective order. An officer who was on duty at the airport approached Estrada and Loera and captured an image of them sitting together on his body camera. Loera explained to the officer that she was trying to cancel the protective order and that she and Estrada were getting remarried. The officer did not arrest Estrada, and Estrada and Loera left the airport together. The incident was referred to a detective who began an investigation into a violation of the active protective order, and an arrest warrant was later issued.

2

On July 2, 2023, Loera spent the day at her condo complex's pool with friends and other residents. Around 9:00 p.m. that day, Loera called 911 to report that Estrada had come to her condo and strangled her. The police responded to the scene and talked with Loera and her neighbors who had come to her condo after learning about the incident. The police also took photos of Loera's injuries. EMS responded, and a paramedic evaluated Loera, documented her vitals and injuries, and wrote down what she said about the incident.

The police investigated this incident, and another arrest warrant for Estrada was issued. The detective assigned to the case emailed Loera on the day after the incident to inquire what had happened. Loera responded and said that she did not "want to press charges[.] I'm moving out of [A]ustin. I just want to be left alone[.] [T]his has become too much for me to handle and is really making me depressed. I no longer want to talk about this anymore." Approximately two weeks later, Loera wrote a follow-up to the detective saying that she was "not pressing charges. I was under the influence." The detective replied, asked whether she was not sure what happened because she was under the influence, and inquired what caused her visible injuries documented on July 2. Loera replied, "To my knowledge [Estrada] was not there. . . . I can't believe any of that happened[.] I was out at the pool from 11:30-7 so I was very sunburned and I was at the lake the whole day before. Everyone that day at the party was on the drug that makes you hallucinate."

In February 2024, Loera filed an affidavit of non-prosecution in which she stated that she invited Estrada to go to Cabo San Lucas with her after the protective order went into effect and that she explained to the police officer at the airport in Austin that she was not in any danger. Regarding the incident on July 2, she averred that she and Estrada "were at my apartment for a pool party" and "got into an argument" and that Estrada "left the party and the

3

apartment." Although she related that she told the police that Estrada assaulted her, she said that the claim "was untrue," that she learned after calling the police that the drinks she had that day "had been spiked," and that she "was hallucinating." Loera stated that she planned to file the paperwork to have the protective order removed, that she was not fearful for her safety, and that she wanted the charges against Estrada dropped. That same month, Loera and Estrada signed an agreed order terminating the protective order early.

After the police finished their investigation, Estrada was charged with the offense of violating a protective order twice within a twelve-month period. *See* Tex. Penal Code § 25.072. During the subsequent trial, the State called as witnesses police officers involved in the investigation, the paramedic who responded to the scene on July 2, the 911 dispatcher who handled Loera's call, a sexual-assault nurse examiner who testified as an expert regarding strangulation, the office manager for Estrada's trial attorney who explained that Estrada's attorney had prepared Loera's affidavit of non-prosecution, a therapist who discussed the dynamics of domestic violence, Loera's neighbor ("Neighbor"), and Neighbor's daughter ("Neighbor's Daughter"). The State successfully sought to admit into evidence a recording of the 911 call, the medical records prepared by the paramedic, and photos showing Loera's injuries on July 2. The State's witnesses testified regarding the events set out above and provided additional information set out below.

Neighbor testified that she was with Loera on July 2 and did not see Loera take any drugs. After Loera left the pool area to return to her condo, Estrada came to the pool and yelled about needing his keys before leaving the premises. After Estrada left, Neighbor's Daughter ran to the pool and said Loera needed Neighbor because Estrada "choked" Loera. Next, Neighbor testified that she ran to Loera's condo and that the police arrived quickly

4

thereafter. Neighbor recalled that Estrada and Loera came to her home for dinner a few weeks before the trial and that Loera, and to a lesser extent Estrada, explained to Neighbor that Neighbor did not have to testify.

Neighbor's Daughter testified that after she left the pool area to return to Neighbor's condo, Loera called her and asked her to find Neighbor because Estrada had choked her. Neighbor's Daughter explained that she ran to the pool to get Neighbor. Daughter did not remember seeing Estrada that day but recalled seeing Loera with Estrada a few weeks before the trial.

In his case-in-chief, Estrada called as witnesses one of his friends ("Friend") who also lived in the condo complex and one of his uncles ("Uncle"). Friend testified that he would regularly hear Loera yelling at Estrada and that Loera was very controlling. Although Friend explained that he had never seen Estrada be physical with Loera, he had seen injuries on Estrada's body. Friend stated that he had reason to believe that Loera would make up the allegations against Estrada. Uncle testified that Loera would throw Estrada out of the house in the middle of the night and that Estrada and Loera's relationship was toxic.

After considering the evidence, the jury found Estrada guilty of violating a protective order twice within a twelve-month period.

During the punishment hearing before the trial court, the State called a police officer who testified that in his experience a victim can be uncooperative with an investigation because she fears being retaliated against and losing the financial contributions from an abuser. Next, the officer discussed an incident on January 27, 2018, concerning a woman who was not Loera. When describing the incident, he stated that the woman told the officer that Estrada had

5

assaulted her, and the officer noticed that the woman had a bruised lip and bloody knees. Photos of the woman and her injuries were admitted into evidence.

Next, the State called an investigator for the district attorney's office who linked Estrada to a prior conviction for possession of a controlled substance (methamphetamine). A certified copy of the prior judgment bearing Estrada's name and State Identification Number was admitted into evidence.

After the State called its last witness, Estrada recalled Uncle, who testified that Loera would throw Estrada out of her home and that he had observed scratches on Estrada. Further, Uncle discussed how Loera chased Estrada in her car and how Estrada found a tracking device in his truck. Uncle related that Estrada was in prison from 2008 to 2018. Estrada called another uncle as a witness, and his other uncle testified that Loera would call and yell at Estrada when Estrada was not with her but that Estrada would not lose his patience and would instead remain calm.

As his last witness, Estrada called his mother. Mother testified that Estrada and Loera had been together for fifteen years and that they had a negative relationship. Further, Mother stated that Estrada could live with her and that she would provide him with support as he got his life back together.

After considering the evidence and arguments by the parties, the trial court sentenced Estrada to six years' imprisonment.

## DISCUSSION

In his first three overlapping issues, Estrada contends that the trial court erred by admitting Loera's medical records and a recording of her 911 call and that the cumulative

6

erroneous admission of the evidence harmed him. In his final issue, he asserts that the trial court erred by granting the State's challenge for cause to Juror 53. We will address his arguments pertaining to the medical records before addressing the claims pertaining to the 911 recording and then address the final issue.

**Medical Records**

In his first and second issues, Estrada argues that the trial court erred by admitting medical records made by the paramedic. He asserts that the medical records contained inadmissible hearsay. Additionally, he contends that the medical records were testimonial in nature and that therefore their admission therefore violated his confrontation rights.

*The Medical Records were Not Testimonial*

During the trial, the trial court admitted medical records made by the paramedic who responded to a call for assistance from one of the police officers who responded to Loera's 911 call. In the records, the paramedic entered Loera's name, identified an injury to her neck from an assault at her home, and listed health information concerning Loera and her injury. The medical records also showed that Loera refused to be transported to the hospital for additional treatment. The medical records had the following redacted "Narrative" section in which the paramedic documented what he learned during his interaction with Loera:

> Upon arrival to the scene patient was found seated on their couch within their residence. Patient was conscious, alert, and oriented. Patient stated her ex-husband had entered her residence, and strangled her. Patient s[t]ated she was pulled by her hair upstairs, and into a closet. From there she was strangled to the point to where she almost lost consciousness. Patient was observed to have a raspy voice, and marks around their neck. Patient reported a burning pain around their neck. Patient reported pain on [range of motion]. Patient did not report pain when their cervical spine was palpated. No petechiae w[ere] found. Patient did not report any change in vision. Patient was adamant in their refusal to go to the

7

hospital. Patient did not want to go to the hospital due [to] not believing anyone could adequately take care of her dog. Patient stated she would seek medical care this coming Wednesday. Patient was informed the[re] could be serious injury to her airway. Patient was informed of the serious risk of perm[an]ant injury, and death due to airway compromise. Patient was informed that an EMS field assessment was limited. Patient was told they could call back at anytime if their condition worsened. All appropriate signatures were obtained. Medic 27 was placed available when appropriate. All times are an approximation.

On appeal, Estrada first argues that the trial court erred by admitting the medical records because they were testimonial and, therefore, admitted in violation of his confrontation rights. When presenting this argument, he asserts that Loera never asked for any medical attention and urges that she was focused on having him apprehended instead. Additionally, he asserts that "[t]here was no testimony that the information in the EMS records was gathered for the purpose of making medical decisions about how to proceed with treatment." Moreover, he emphasizes that the paramedic "testified that he was taught 'signs, symptoms, and how to properly **identify** victims of strangulation,' rather than how to **treat** victims of strangulation." For these reasons, he urges that the State failed to meet its burden of proving both that the primary purpose of the medical records was for medical diagnosis and treatment and that they were not testimonial.

Generally, before a party may present "a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion" "with sufficient specificity to make the trial court aware of the complaint." *See* Tex. R. App. P. 33.1(a). "To be timely, a complaint must be made as soon as the grounds for complaint [are] apparent or should be apparent." *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). In other words, the party "must have objected to the evidence, if possible, before it was actually admitted." *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim.

8

App. 1991). "If this was not possible, the defense must have objected as soon as the objectionable nature of the evidence became apparent." *Id.*

Preservation of error is a "systemic requirement" on appeal. *See Darcy v. State*, 488 S.W.3d 325, 327 (Tex. Crim. App. 2016). An issue raised on appeal generally must be preserved by a specific objection at trial. *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009). Accordingly, to preserve a complaint on appeal, the party must make a specific objection letting the trial court "know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Id.* at 312-13 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)); *see Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009).

Even "constitutional rights," including those that implicate a defendant's right to confrontation, "may be forfeited for purposes of appellate review unless properly preserved." *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009). "To preserve error on Confrontation-Clause grounds, the objector must voice the complaint as soon as the basis for the objection becomes apparent." *Craven v. State*, 579 S.W.3d 784, 787 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *see also Linney v. State*, 401 S.W.3d 764, 772 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) ("The Constitution does not relieve a defendant from the obligation to comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."). The preservation rule "ensures that trial courts are provided an opportunity to correct their own mistakes at the most convenient and appropriate time—when the mistakes are alleged to have been made." *Hull v. State*, 67 S.W.3d 215, 217 (Tex. Crim. App. 2002). The need to inform the court of the basis for an objection is greater for constitutional complaints than for nonconstitutional ones "because constitutional error

9

is subject to a much stricter harm analysis on appeal." *Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012).

Shortly after the paramedic began testifying, the State moved to have the medical records admitted into evidence, and Estrada objected to the admission on hearsay grounds. During a lengthy bench conference, the State argued that the exhibit was admissible under the hearsay exceptions for business records and for statements made for medical diagnosis or treatment. In response, Estrada argued that the exception for medical diagnosis or treatment did not apply because Loera was not seeking medical care when she made the statements and because she did not accept any diagnosis or treatment. The trial court explained that Loera was treated even if she did not end up going to the hospital, overruled Estrada's objection, and admitted the exhibit. Estrada asked for and received a running objection on the grounds previously asserted. Estrada then made another objection asserting that the identity of the perpetrator should be removed from the records because the identity "does not matter for medical diagnosis or treatment." The trial court overruled that objection as well. Estrada did not argue in the bench conference that the records were testimonial or that their admission violated his confrontation rights.

During the paramedic's subsequent testimony, the following exchange occurred:

[State]: [Paramedic], I'm showing you what's been marked State's Exhibit 8, what's been admitted into evidence. And do you know what that is?

[Paramedic]: This is my narrative and chart from that evening.

[State]: Okay. And that's your report from this incident?

10

[Paramedic]: That's correct.

[State]: Would it help you to refer to that report when you testify before the jury about this incident?

[Paramedic]. Yes, it would.

[State]: Okay. Your Honor, permission to publish?

[Trial Court]: You may.

[State]: What you have in front of you is up on the screen behind you as well. Can you tell me, what time did you respond to the scene?

[Paramedic]: We were dispatched at just past 9:30 at night.

[State]: Okay. And what was the patient's name?

[Paramedic]: First name Sylvia, last name Loera, I believe. L-o-e-r-a.

[State]: Okay. And when you went to the scene, were you alone or was someone with you?

[Paramedic]: I had a paramedic partner assisting me.

[State]: Is that normal to have a two-man team responding to any given call?

[Paramedic]: Yes.

At that point, Estrada objected that the narrative portion of the medical records was testimonial, asserted that this objection "is a separate objection than just hearsay," and argued that "the rule of evidence does not trump the confrontation clause." During another lengthy bench conference that resulted in the jury being excused, the parties argued whether the

11

contents of the narrative were testimonial. The State argued that the report was not made in contemplation of being used later in a prosecution and that medical records made in response to an emergency are not testimonial. After considering the parties' arguments, the trial court determined that the medical records were not testimonial.[1]

During the first bench conference, Estrada objected to the admission of the medical records, but he did so on hearsay grounds. *See Holland v. State*, 802 S.W.2d 696, 700 (Tex. Crim. App. 1991) (explaining that hearsay objection does not preserve Confrontation Clause complaint because those complaints "are neither synonymous nor necessarily coextensive"). Despite the parties specifically addressing the narrative portion of the records during the bench conference, Estrada did not argue that the narrative section was testimonial and should not be admitted under the Confrontation Clause. Only after the exhibit was admitted into evidence, published to the jury on a screen, and testified about was a separate objection made on the ground that the narrative was testimonial. *See Ethington*, 819 S.W.2d at 858. Accordingly, Estrada did not object as soon as the objectionable nature of the evidence became apparent and, therefore, did not preserve this argument for appellate consideration. *See id. Compare Mendoza v. State*, No. 08-17-00230-CR, 2019 WL 6271271, at *4 (Tex. App.—El Paso Nov. 25, 2019, pet. ref'd) (op., not designated for publication) (determining that defendant preserved Confrontation Clause objection made during bench conference after exhibit was admitted into evidence because objection was made "immediately after the trial court admitted the exhibit," because "no witness testified about it," and because "the admitted exhibit was not yet published to the jury"); *and Johnson v. State*, 747 S.W.2d 451, 453 (Tex. App.—Houston [14th Dist.]

---

[1] The trial court did conclude that two sentences in the narrative in which Loera described threats made by Estrada should be redacted because they were not made for the purpose of receiving medical treatment.

12

1988, pet. ref'd) (finding objection to videotape was timely when it was made after admission of exhibit but before it was played to the jury), *with Joiner v. State*, No. 05-90-01495-CR, 1995 WL 500304, at *8 (Tex. App.—Dallas Aug. 23, 1995, no pet.) (op., not designated for publication) (concluding that defendant did not preserve objection because it was made after trial judge had admitted exhibit and after it was read out loud to jury), *and Turner v. State*, 642 S.W.2d 216, 217 (Tex. App.—Houston [14th Dist.] 1982, no pet.) (determining that objection to several exhibits was untimely because it came after witness testified about them).

Even if the objection were timely given the circumstances here, we would still be unable to sustain Estrada's claim because we would conclude that the medical records were not testimonial and that, therefore, their admission did not violate his confrontation rights.

Under the Sixth Amendment, "the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The United States Supreme Court explained in *Crawford v. Washington* that confrontation rights apply not only to in-court testimony but also to out-of-court statements that are testimonial in nature. *See* 541 U.S. 36, 59 (2004). The Confrontation Clause prohibits the admission of testimonial hearsay unless two criteria are met: the declarant is unavailable to testify, and the defendant had a prior opportunity to cross-examine the declarant. *Id.* at 68. This rule applies even if the statement falls within a "firmly rooted hearsay exception or bears particularized guarantees of trustworthiness." *Wall v. State*, 184 S.W.3d 730, 735 (Tex. Crim. App. 2006) (internal quotation marks and citation

13

omitted). A determination regarding whether an out-of-court statement is testimonial is a question of law. *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008).

"Testimonial" statements are those made under circumstances leading an objective witness to reasonably believe that the statements would be available for use at a later trial. *See Wall*, 184 S.W.3d at 735. Stated differently, a statement is testimonial when the circumstances demonstrate that the primary purpose of obtaining it "is to establish or prove past events" to further a criminal prosecution. *See De La Paz*, 273 S.W.3d at 680. However, if the primary purpose of the statement is something other than to further a criminal prosecution, "the Confrontation Clause does not require such statements to be subject to the crucible of cross examination." *See Michigan v. Bryant*, 562 U.S. 344, 361 (2011). For example, medical records prepared for the primary purpose of treatment are not testimonial. *See Berkley v. State*, 298 S.W.3d 712, 715 (Tex. App.—San Antonio 2009, pet. ref'd).

The Supreme Court in *Crawford* did not comprehensively define "testimonial," but it did note the following three types of "core" testimonial evidence: (1) "*ex parte* in-court testimony or its functional equivalent," such as affidavits, custodial examinations, prior testimony not subject to cross-examination, or "similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements" of the same nature "contained in formalized testimonial materials"; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 51-52, 68. The Court further explained that the term "testimonial" applies "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68.

14

Prior to the paramedic's testifying, the 911 dispatcher testified that Loera was scared and crying. Additionally, the responding police officer said that Loera was "emotional," "crying," and "nervous" and related that she could not breathe, was scared, was in pain, and had a raspy voice consistent with having been strangled. In his testimony, the paramedic explained that when he responds to a 911 call and sees a patient, he first assesses the patient for his or her "overall presentation," looks for "obvious signs of trauma," determines whether the patient is conscious, and ascertains whether there are "general life threats." Additionally, he testified that as part of his assessment, he asks his patients for a medical history about how they got their injuries and asks them "about the timeline of events that led up to them calling for me." Further, he clarified that getting this information "allows me to get a better sense of what type of illness or injury a patient can have" and what type of "treatment options" there are "for the patient." Next, he testified that he takes "notes on scene" regarding his observations and what led his patients to reach out for help. The paramedic related that he had received training and education concerning strangulation victims and learned the "signs" and "symptoms" of strangulation and "how to properly identify victims of strangulation." For example, he discussed how people who have been strangled can have distinct breathing patterns, be hoarse, have difficulty swallowing, and have marks on their necks. Relatedly, he explained that Loera had pain in and red marks on her neck, that he observed that her voice was raspy, and that she told him that her voice did not normally sound that way. Moreover, he testified that he was called to her home in his capacity as an employee for EMS on July 2 and prepared the records at issue.

Although the medical records show that Loera ultimately refused to go to the hospital, the records also establish that the paramedic was attempting to treat and diagnose her by repeatedly checking her vital signs, evaluating her mental status, and asking about her injuries.

15

The narrative portion of the records summarized how Loera said she was injured and by whom, documented the injuries and symptoms that she had at the time of the evaluation, and chronicled the need for additional treatment because of the serious risk of permanent injury and death from a compromised airway. *See Hudson v. State*, 179 S.W.3d 731, 737-38 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (concluding that statements made to responding paramedic were not testimonial because there was no reason to believe victim who was upset and shaken "reasonably expected her statements to be used in a judicial setting"); *see also Moyer v. State*, 948 S.W.2d 525, 527-28 (Tex. App.—Fort Worth 1997, pet. ref'd) (determining that "subjective" statements of victim recorded in paramedic's report concerning "current injury or illness as well as past medical history" were made for purpose of medical treatment or diagnosis).

The medical records were not the functional equivalent of ex parte in-court testimony and were not contained in formalized testimonial materials. *See Crawford*, 541 U.S. at 51-52. They also were not made under circumstances that would lead an objective witness to reasonably conclude that the record would be available for use at a later trial, *see id.* at 51, because they were created primarily for medical diagnosis and treatment. Accordingly, the records were not testimonial. *Cf. Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2 (2009) (explaining that "medical reports created for treatment purposes" are not testimonial). Therefore, if Estrada's issue were preserved, we would conclude that the admission of the medical records did not violate the Confrontation Clause. *See Sullivan v. State*, 248 S.W.3d 746, 750 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (noting that numerous Texas courts agree that medical reports are non-testimonial); *see also Garza v. State*, No. 13-19-00472-CR, 2021 WL 822301, at *6 (Tex. App.—Corpus Christi-Edinburg Mar. 4, 2021, no pet.) (mem. op., not designated for

16

publication) (determining that defendant's confrontation rights were not violated by admission of medical records created for medical purpose).[2]

*The Medical Records Fell Under Exception to Hearsay*

On appeal, Estrada argues that the medical records were also not admissible because they contained hearsay and because the hearsay exception for statements related to medical diagnosis or treatment under Rule of Evidence 803(4) did not apply. *See* Tex. R. Evid. 801, 803(4). More specifically, he focuses on the portion of the records identifying him as the assailant and asserts that the records did "not contain any clinical indication that EMS personnel used the identity of the perpetrator for diagnosis, treatment, or risk assessment." Further, he contends that "no EMS personnel testified at trial to explain the purpose of Loera's statements, whether they were relevant to her care, or whether they were actually relied upon in clinical decision-making." Accordingly, he urges that "the State failed to meet its burden under Rule

---

[2] As support for his arguments that the medical records were testimonial, Estrada relies on *De La Paz v. State*, 273 S.W.3d 671, 672 (Tex. Crim. App. 2008). In that case, the Court of Criminal Appeals determined that the State failed to meet its burden of showing that the victim's medical records from a hospital were not testimonial. *Id.* at 681. Those records included handwritten notes from three of the employees documenting the victim's description of how the defendant had caused her injury. *Id.* at 675. The records in that case were prepared days after the defendant had become a suspect. *Id.* at 681. When the defendant objected to the admission of the records on confrontation grounds, "[t]he State . . . made no effort to establish that the notes were admissible under the Confrontation Clause." *Id.* at 676. For these reasons, the Court of Criminal Appeals concluded that the State had failed to meet its burden of showing that the records were admissible because it failed to establish why the interview forming the basis for some of the notes was performed by a social worker two days after the defendant became a suspect or why the social worker "immediately after the interview . . . contacted Child Protective Services and the Sweetwater police." *Id.* at 681. Here, in contrast, the medical records were made on the day of the incident after Loera had called 911 for help and was exhibiting symptoms from the assault at the time she was evaluated by the paramedic, and the State did argue at trial that the records were not testimonial.

17

803(4)" and that the trial court erred by failing to redact the identity of the alleged assailant in the records.[3]

Appellate courts review a trial court's ruling regarding the admission or exclusion of evidence for an abuse of discretion. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). Under that standard, a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside "the zone of reasonable disagreement," *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is "arbitrary or unreasonable," *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). Moreover, the ruling will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct under any theory of law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). In addition, an appellate court reviews the trial court's ruling in light of the record before the court "at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.).

Under the Rules of Evidence, hearsay is a statement that "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove

---

[3] In his brief, Estrada styled the heading for this portion of the argument section as "The Trial Court Erred by Admitting Hearsay in the 911 Call." However, he does not address the 911 call in the analysis and instead focuses exclusively on the medical records prepared by the paramedic. Accordingly, to the extent that Estrada is attempting to challenge the admission of the 911 recording on hearsay grounds, he has not sufficiently briefed that issue. *See* Tex. R. App. P. 38.1(i) (requiring parties to provide substantive legal analysis in their briefs); *see also Houston v. State*, 729 S.W.3d 508, 525 (Tex. App.—Austin 2026, no pet.) ("Given the lack of briefing on this set of arguments, we conclude that these claims were not adequately briefed."). In any event, Estrada did not object to the admission of the 911 recording on hearsay grounds. *See* Tex. R. App. P. 33.1; *see also Murray v. State* 597 S.W.3d 964, 972-73 (Tex. App.—Austin 2020, pet. ref'd) (explaining that Confrontation Clause objection does not preserve complaint that evidence was inadmissible hearsay); *Tolbert v. State*, No. 05-24-00588-CR, 2025 WL 897488, at *1 (Tex. App.—Dallas Mar. 24, 2025, no pet.) (mem. op., not designated for publication) (determining that appellant did not preserve hearsay issue because he "did not raise a hearsay objection" at trial).

18

the truth of the matter asserted in the statement." Tex. R. Evid. 801(d). Hearsay is not admissible unless provided otherwise by "a statute," the Rules of Evidence, or "other rules prescribed under statutory authority." *Id.* R. 802. The following type of statement is excluded from the rule against hearsay: "A statement that . . . is made for—and is reasonably pertinent to—medical diagnosis or treatment . . . and . . . describes medical history; past or present symptoms or sensations; their inception; or their general cause." *Id.* R. 803(4).

The exception contained in Rule 803(4) is based on the patient's selfish motive in receiving appropriate medical treatment, *Jones v. State*, 92 S.W.3d 619, 623 (Tex. App.—Austin 2002, no pet.), *overruled in part on other grounds by Taylor v. State*, 268 S.W.3d 571, 589 (Tex. Crim. App. 2008), and on "the assumption that the declarant appreciates that the effectiveness of the diagnosis or treatment may depend on the accuracy of the information provided," *Munoz v. State*, 288 S.W.3d 55, 58 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

In order for evidence to be admissible under this exception, "the proponent normally must show that (1) the declarant 'was aware that the statements were made for purposes of medical diagnosis or treatment and that proper diagnosis or treatment depended upon the veracity of the statements' and (2) 'the statements are pertinent to diagnosis or treatment, i.e., that it was reasonable for the care provider to rely on the statements in diagnosing or treating the declarant.'" *State v. Sanchez*, 722 S.W.3d 58, 70-71 (Tex. App.—Fort Worth 2025, pet. ref'd) (quoting *Lumsden v. State*, 564 S.W.3d 858, 883 (Tex. App.—Fort Worth 2018, pet. ref'd)); *see Mbugua v. State*, 312 S.W.3d 657, 670-71 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). "[I]n the emergency room in the immediate aftermath of an injury or on the physician's cold examination table in the interest of diagnosing and curing some exigent disease or ailment," "it seems only natural to presume that adults, and even children of a sufficient age or apparent

maturity, will have an implicit awareness that the doctor's questions are designed to elicit accurate information and that veracity will serve their best interest." *Taylor*, 268 S.W.3d at 589. "This explains the almost universal tendency of courts under these circumstances to assay the record, not for evidence of such an awareness, but for any evidence that would *negate* such an awareness, even while recognizing that the burden is on the proponent of the hearsay to show that the Rule 803(4) exception applies." *Id.*; *see Sanchez*, 722 S.W.3d at 71.

As set out earlier, the paramedic testified that he asks his patients for a medical history regarding how they were injured as part of the process of determining how to treat them. *See Moyer*, 948 S.W.2d at 527-28 (determining that statements to paramedic included in paramedic's report were admissible under Rule 803(4)). Consistent with the directives above, nothing in the record negates that Loera was aware that the paramedic's questions were designed to elicit accurate information and that telling the truth would serve her best interest. *See Taylor*, 268 S.W.3d at 589. On the contrary, the medical records specifically stated that the paramedic warned Loera of the serious consequences of not treating an injury to the airway. Moreover, the paramedic responded after Loera called 911 needing help, and she reported having been strangled, a burning pain around her neck, and pain when moving. *See Moyer*, 948 S.W.2d at 528 ("[W]hen a patient makes statements for purposes of medical diagnosis or treatment and describes medical history, present symptoms, pain, or sensations, or the inception or external source thereof insofar as reasonably pertinent to diagnosis or treatment, those statements are admissible as exceptions to the hearsay rule.").

Although the records also contained Loera's identification of Estrada as the assailant when documenting that her ex-husband entered her home to strangle her, statements similar to those have been held admissible as statements made for the purpose of medical

20

diagnosis or treatment under Rule 803(4). *See Sadler v. State*, No. 10-07-00323-CR, 2009 WL 1163407, at *5 (Tex. App.—Waco Apr. 29, 2009, pet. ref'd) (mem. op., not designated for publication) (concluding that statements made to nurse by victim identifying person who robbed him and how victim had been assaulted were admissible under Rule 803(4)); *Williams v. State*, No. 04-01-00786-CR, 2002 WL 2008084, at *2 (Tex. App.—San Antonio Sept. 4, 2002, no pet.) (mem. op., not designated for publication) (determining that statement by victim to emergency room doctor that her husband had assaulted her and caused her injuries was admissible under Rule 803(4)); *Reyes v. State*, 48 S.W.3d 917, 922 (Tex. App.—Fort Worth 2001, no pet.) (deciding that statement by victim to treating physician that "husband assaulted her [with] fists" was made for purpose of medical diagnosis or treatment and was admissible under Rule 803(4)).

For these reasons, we conclude that the trial court could have reasonably concluded that the medical records, including the portion identifying Loera's ex-husband as the assailant, were admissible under Rule 803(4) and, therefore, did not abuse its discretion by overruling Estrada's objection and admitting the medical records. *Cf. Munoz*, 288 S.W.3d at 60 (determining in sexual-abuse case that identity of perpetrator as victim's father "was of critical importance in preventing further harm or abuse").

**Recording of 911 Call**

In his first issue, Estrada also contends that the trial court erred by admitting the recording of the 911 call because it was testimonial in nature and because its admission, therefore, violated his confrontation rights.

21

*The 911 Call was Not Testimonial*

At the start of trial before the State called its first witness, Estrada informed the trial court outside the presence of the jury that the State planned to play Loera's July 2 911 call to the police, and Estrada argued that the trial court should not admit the recording because her statements to the dispatcher were testimonial and because he would not have an opportunity to cross-examine Loera. Additionally, Estrada asserted that there was no ongoing threat to Loera because she made the call after he left and did not state that she thought he might return. In response, the State argued that the statements were not testimonial because they were given during an emergency. At the hearing, a recording of Loera's 911 call was played. On the approximately five-minute recording, Loera can be heard with a raspy voice. She was also crying and seemed out of breath. During the call, the following exchange occurred:

[Loera]: Oh my God.

[Dispatcher]: Travis County 911. What is the address of the emergency?

[Loera]: Hi. [Address given]. My husband tried to kill me. I mean my ex-husband. Yes hurry. He tried to kill me.

[Dispatcher]: I understand. [Repeats part of address back]. What is the street name?

[Loera]: [Repeats part of address]. He choked me.

[Dispatcher]: What is the street name, ma'am? What is the street name?

[Loera]: [Repeats part of address].

[Dispatcher]: [Repeats address].  That is what I needed to know.  Where is he right now?  Where is he right now?

[Loera]: He's here.

[Dispatcher]: Are you in the same room with him?  Did you get away?  I need you to get away from him.

[Loera]: He's here.  I'm right here.  Hurry.  Please hurry.

[Dispatcher]: Ma'am.  Are you near him, or are you away from him?

[Loera]: No.  I am away.

[Dispatcher]: Okay.  That's what I want to know.  What apartment are you in?  What apartment are you in?

[Loera]: [Says condo number].

[Dispatcher]: Okay.  I have them coming as fast as I can.  What is his name?

[Loera]: Frank Estrada.  Oh my God.  I cannot breathe.  I can't breathe.

[Dispatcher]: I have help coming as fast as I can.  Are you able to get outside or go to another room?  Somewhere safe where you can lock the door?

[Loera]: [Cries]

[Dispatcher]: Ma'am, I have units coming as fast as I can like I said.  What is Frank wearing?

[Loera]: [Sobs].  He is wearing white [inaudible] with gray slacks.

[Dispatcher]: He's got a white and black shirt?

[Loera]: He's got a black shirt.  Gray pants.  Please hurry.

[Dispatcher]: And what kind of car does he have?  If he leaves, what kind of car does he have?

[Loera]: A white truck.

[Dispatcher]: A white truck?

[Loera]: He [jumped or choked] me.

[Dispatcher]: I know.  And I have help coming.  What's your name?

[Loera]: Oh my God.  [Sobs].

[Dispatcher]: What's your name?

[Loera]: Oh my God.  He hurt me.

[Dispatcher]: I have a lot of help coming to help you.  What's your name? Ma'am, what's your name?

[Loera]: [Talking muffled]

[Loera]: (speaking quietly) You should not have done that to me.

[Male voice]: [Indecipherable]

[Loera]: Yes, you did.  You choked me.

[Male voice]: I didn't.

[Dispatcher]: Ma'am who are you speaking to?  Who else is there with you?

[Loera]: He is walking out.  You're leaving.

[Dispatcher]: Okay I have an officer that is pulling in now.  This is the [name of complex], correct?

[Loera]: Uh huh.

[Dispatcher]: I have an officer pulling in now.  Is there a building number with your unit?

[Loera]: [Says condo number]

[Dispatcher]: No, I got [condo number].  Is there a building number?

[Loera]: [Whispers]

[Dispatcher]: Hello?  Ma'am, who else is there with you?

[Loera]: There is no one.  [Whispers].

[Dispatcher]: Okay, it just sounds like you are talking to someone in the background.

[Loera]: I am talking to you.

[Dispatcher]: Well, I keep asking questions, and you aren't answering my questions.  It sounds like there is someone there.

[Loera]: There is no one here.  There is no one here.

[Dispatcher]: That's okay.  I understand.

[Loera]: Okay, I gotta go.  Look, either you get the help here or you don't.  Either way.

25

[Dispatcher]: They're already there.  They're already there.  They're already there.

[Loera]: There is no one here.

[Dispatcher]: Help is coming.  They are pulling into your facility.

[Loera]: Tell them to pull over a white pickup truck.

[Dispatcher]: I did tell them.  I did tell them he left in a truck.

[Loera]: No.  The cops are right here, and he pulled right in front of them.  Huh.

[Dispatcher]: Ma'am, I told them what kind of truck.

[Loera]: Okay babe.

[Dispatcher]: Okay, I told them what kind of truck.  A white truck.  I have a lot of units that are on scene now.

[Loera]: I'm embarrassed.  There is nobody here.  It's okay.  It is the same thing that happens every time.  I'm disappointed.  I have a protective order on him.  Why is he here?  Aaargghhh.  I can't take it anymore.  Oh my God.

[Dispatcher]: Is there anything distinct about his truck?

[Loera]: I gotta go.  Bye.

[Dispatcher]: Okay.  Bye bye.

[Loera]: GMC white pickup.

[Dispatcher]: GMC white pickup.  Okay.  Does it have any stickers or anything on it?

[End of call]

After listening to the recording and considering the parties' arguments, the trial court determined that the contents of the recording were not testimonial and that the recording was, therefore, admissible. The recording was later played for the jury during the testimony of the 911 dispatcher.

On appeal, Estrada contends that the trial court erred by admitting the recording because the 911 call "was testimonial and was introduced without any opportunity for cross-examination, in violation of the Confrontation Clause." First, he argues that the call was made after the incident was over and notes that Loera spoke in past tense when describing the incident to the dispatcher (e.g. "tried to kill," "jumped," and "hurt" her). Moreover, Estrada asserts that Loera indicated that she was away from him during the phone call and did not state that she was worried that he would return after he left. Additionally, he contends that the contents of the recording indicate that Loera's purpose in making the statements was to document the crime and initiate his arrest by telling the dispatcher to hurry and repeatedly describing the truck. Further, he notes that Loera never asked for an ambulance or asserted that "she needed immediate police protection." He argues that statements concerning his identity, mode of transportation, and direction of travel were testimonial in nature and were not aimed at resolving an emergency. Alternatively, Estrada asserts that even if the beginning portion of the recording was not testimonial, "any non-testimonial character dissolved the moment it became clear [he] was no longer present and [she] was safe." Building on this concept, Estrada urges that the trial court should have conducted "a statement-by-statement analysis, recognizing that a single conversation may shift from non-testimonial to testimonial as the situation unfolds."

As set out above, appellate courts review a ruling as to whether statements are testimonial de novo. *Wall*, 184 S.W.3d at 742. Further, appellate courts perform the review using "the standard of an objectively reasonable declarant standing in the shoes of the actual declarant." *Id.* at 742-43. Based on governing authority from Texas and other jurisdictions, one of our sister courts of appeals has set out the following "principles that guide" whether a statement is testimonial:

> (1) Testimonial statements are official and formal in nature.

> (2) Interaction with the police initiated by a witness or the victim is less likely to result in testimonial statements than if initiated by the police.

> (3) Spontaneous statements to the police are not testimonial.

> (4) Responses to preliminary questions by police at the scene of a crime while police are assessing and securing the scene are not testimonial.

*Spencer v. State*, 162 S.W.3d 877, 882 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (internal citations omitted).

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006). "They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* Although "[t]he inquiries of a police operator in the course of a 911 call are an interrogation in one sense," they

are "not in a sense that 'qualifies under any conceivable definition.'" *Id.* at 823 (footnote omitted). "A 911 call . . . and at least the initial interrogation conducted in connection with a 911 call[] is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827. "That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon." *Id.* Statements made in a 911 call "are not given in response to structured police questioning or with an eye to future legal proceedings but are initiated by a victim or witness to obtain police assistance" and "do not bear any of the official, formal qualities of the police interactions the Confrontation Clause was intended to protect against." *Ruth v. State*, 167 S.W.3d 560, 569 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

"This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot, . . . 'evolve into testimonial statements,' . . . once that purpose has been achieved." *Davis*, 547 U.S. at 828 (quoting *Hammon v. State*, 829 N.E.2d 444, 457 (Ind. 2005), *overruled on other grounds by Davis*, 547 U.S. 813). For example, once a 911 operator "gained the information needed to address the exigency of the moment," the emergency can end when an abuser drives away from the premises, in which case "[i]t could be readily maintained that" statements made in response to continued questioning are testimonial. *Id.* at 829. "[T]rial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial" and "redact or exclude the portions of any statement that have become testimonial." *Id.*

In this case, Loera initiated the contact by calling 911 and reported that Estrada had assaulted her by strangling her. *See Ruth*, 167 S.W.3d at 564, 569 (noting that 911 caller

29

said she left house after her husband and his girlfriend "started arguing" and after he "pulled out a gun" and concluding that statements were not testimonial). Before Loera called 911 on July 2, the police had already obtained an arrest warrant for Estrada's arrest for previously violating the protective order. *See Dixon v. State*, 244 S.W.3d 472, 484-85 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (noting in testimonial analysis concerning 911 recording that defendant was wanted by police for another offense). Although she did not report that the assault was still ongoing, she related that she was having difficulty breathing and that the person who assaulted her was still in her home. She could be heard crying on the phone and appeared to be having difficulty catching her breath. Although she later communicated that she was away from the assailant, she could be heard telling someone nearby that he "should not have . . . choked" her, and the man can be heard on the recording responding to her and seemingly denying the claim. *See Vinson v. State*, 252 S.W.3d 336, 339 (Tex. Crim. App. 2008) (noting that testimonial analysis considers whether "situation was still in progress" and whether primary purpose "was to render aid"). At that point, which was approximately two-thirds of the way through the 911 call, Loera reported to the dispatcher that the man was leaving and told the man "You're leaving." Accordingly, Loera "was facing an ongoing emergency" until Estrada left and had made "a call for help against bona fide physical threat." *Davis*, 547 U.S. at 827. Additionally, the dispatcher repeatedly related that he was sending help and focused on ensuring that Loera was safe. *See Vinson*, 252 S.W.3d at 339 (explaining that testimonial analysis considers "whether the primary purpose . . . was to render aid rather than to memorialize a possible crime"). Moreover, the questions asked by the dispatcher, such as what was Loera's address, whether the assailant was around, what was his identity, what was he wearing, what kind of vehicle he drove, and what her

name was, "were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past." *Davis*, 547 U.S. at 827.

Additionally, as opposed to statements given in a police station or something similar, Loera's "frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id.*; *see also Santacruz v. State*, 237 S.W.3d 822, 828-29 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (determining that statements on 911 recording describing how caller's husband assaulted her ten to fifteen minutes earlier before leaving were not testimonial even though they were not "describing events as they were happening" because that is only one factor to consider in determining whether statement was testimonial, because caller was facing ongoing emergency, because questions asked and answered "were necessary to effectively address the present emergency," and because recording showed that caller was distraught in environment that was not tranquil); *Cook v. State*, 199 S.W.3d 495, 498 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (concluding that statements made on 911 call were not testimonial because they were made to inform police of potential crime in progress, because they were initiated by caller, because they were made informally, and because they were related "at the beginning of the investigation").

Based on the preceding, we conclude that the primary purpose of Loera's 911, at least until Estrada left the area, "was to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 828. "She simply was not acting as a *witness*; she was not *testifying*." *Id.* "What she said was not 'a weaker substitute for live testimony' at trial." *Id.* (quoting *United States v. Inadi*, 475 U.S. 387, 394 (1986)). Her "emergency statement does not" "align[] perfectly with [a] courtroom analogue[]" because "[n]o 'witness' goes into court to proclaim an emergency and seek help." *Id.* Accordingly, we conclude that Loera's statements on the first

31

part of the recording, including the ones "identifying [Estrada] as her assailant" and as the person in the home with her "were not testimonial." *Id.* at 829; *see also Kearney v. State*, 181 S.W.3d 438, 443 (Tex. App.—Waco 2005, pet. ref'd) (determining that statements made in 911 call to report robbery in progress and to summon emergency help were not testimonial and that, therefore, confrontation rights were not violated).[4]

Even if some the statements captured on the 911 recording after Estrada left could be considered testimonial and if their admission violated his confrontation rights, we would be unable to sustain this issue on appeal. If a defendant's confrontation rights are violated, appellate courts must determine whether the error was harmless. *See Smith v. State*, 726 S.W.3d 466, 473 (Tex. Crim. App. 2025). Appellate courts "review constitutional error in the admission of testimonial statements in violation of the Confrontation Clause under the standard specified in Rule 44.2(a) of the Texas Rules of Appellate Procedure." *Allison v. State*, 666 S.W.3d 750, 763 (Tex. Crim. App. 2023).

Under Rule 44.2(a), constitutional error must be reversed unless the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or

---

[4] In his brief, Estrada points to an opinion from one of our sister courts of appeals that determined that the admission of a 911 call concerning an assault was testimonial in nature. *See Gutierrez v. State*, 516 S.W.3d 593, 599 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). Although our sister court noted that the victim in that case, like Loera here, did not request medical treatment when deciding that the recording was testimonial, the court also emphasized that the caller discussed only what happened in the past without any concern that there was an ongoing emergency and that the defendant left the scene after the offense. *Id.* at 598-99. The circumstances here differ, and the case law set out above persuades us that the recording in this case was not testimonial. *See Ex parte McDonald*, 606 S.W.3d 856, 863 (Tex. App.—Austin 2020, pet. ref'd) (noting that cases from sister courts of appeals are not binding precedent); *see also Dixon v. State*, 244 S.W.3d 472, 485 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (determining that 911 recording was not testimonial even though victim did not request medical treatment in part because victim initiated 911 call that was not official and because caller was "distressed" after her "'boyfriend just beat [her] up'").

punishment. Tex. R. App. P. 44.2(a). If the verdict "would have been the same absent the error then the error is harmless." *Davis v. State*, 268 S.W.3d 683, 707 (Tex. App.—Fort Worth 2008, pet. ref'd). The following factors are relevant to determining whether constitutional error under *Crawford* may be declared harmless beyond a reasonable doubt: (1) the importance of the out-of-court statement to the State's case; (2) whether the statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the statement on material points; and (4) the overall strength of the State's case. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007); *Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006); *Render v. State*, 347 S.W.3d 905, 918-19 (Tex. App.—Eastland 2011, pet. ref'd). Thus, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002).

The emphasis of a harm analysis under Rule 44.2(a) should not be on the propriety of the outcome of trial. *Scott*, 227 S.W.3d at 690. Rather, we must determine whether the error adversely affected the integrity of the process leading to the conviction. *Id.* The question for the reviewing court is not whether the jury verdict was supported by the evidence. *Id.* Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at the verdict. *Id.* In performing a harm analysis, a reviewing court may also consider the source and nature of the error, the amount of emphasis by the State on the erroneously admitted evidence, and the weight the jury may have given the erroneously admitted evidence compared to the balance of the evidence with respect to the element or defensive issue to which it is relevant. *Id.*

In his brief, Estrada contends that the admission of the 911 recording was not harmless because it, along with the EMS records, "were the only evidence identifying [him] as

the person who allegedly strangled the complainant" and that without this evidence "there would have been no admissible evidence of strangulation at all." Further, he argues that this evidence of strangulation "formed the core of the prosecution's narrative." Additionally, he asserts that the only other evidence placing him with Loera on July 2 "was her affidavit of non-prosecution—a document in which she stated she was hallucinating after her drink had been spiked." Next, he highlights that Loera emailed a police officer to state that she was on a hallucinogen that day and that she did not think Estrada was even present on the day in question. Further, he notes that Neighbor's Daughter, who was with Loera on July 2, testified that she did not remember seeing him that day. Estrada opines that without the emotionally charged accusations in the 911 call, the jury may have viewed Loera's contradictory statements to the police with skepticism and would not have viewed her as a victim afraid of his violence. For those reasons, he argues that without the inadmissible evidence, the jury would have had no reasons to disregard Loera's recantation.

As an initial matter, we note that the jury did not convict Estrada of the second count (assault family violence) or the third count (aggravated assault with a deadly weapon), which both alleged that he had strangled Loera. Instead, they convicted him only of the offense of violating a protective order, which did not include strangulation as an element. If the jury did not believe that Estrada assaulted Loera by strangling her, it is hard to see how evidence pertaining to the alleged strangulation could have improperly persuaded the jury to find Estrada guilty of violating a protective order. *See Tienda v. State*, 479 S.W.3d 863, 881 (Tex. App.—Eastland 2015, no pet.) (observing in nonconstitutional context that erroneous admission of evidence pertaining to charge for which defendant was acquitted was harmless); *see also Smith v. State*, 436 S.W.3d 353, 372 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (noting in

34

constitutional context that appellate courts consider whether erroneous admission of evidence "was actually a contributing factor in the jury's deliberations in arriving at a verdict").

In any event, as set out above, the portions of the recording identifying Estrada as the assailant, as being in the home, and as having strangled Loera were not testimonial in nature and were not admitted in violation of his constitutional right to confrontation. *Davis*, 547 U.S. at 829. Accordingly, the admission of those statements could not have been harmful under Rule 44.2(a). *See Potter v. State*, 74 S.W.3d 105, 116 (Tex. App.—Waco 2002, no pet.) (Gray, J., concurring) ("A harm analysis is only necessary if there is error.").

Even assuming that admission of the portion of the 911 recording pertaining to events occurring after Estrada left was error, the topics discussed during the first part of that portion included what condo unit Loera lived in, whether there was anyone else in the condo with her, if the police had arrived, what type of truck the assailant had, and whether the police were near that vehicle. These topics were not emphasized by the State, nor were they important to its case. *See Langham v. State*, 331 S.W.3d 87, 91 (Tex. App.—Eastland 2010, pet. ref'd) (concluding that admission of out-of-court statements was harmless beyond reasonable doubt).

In the last portion of the call, Loera informed the dispatcher that she had a protective order against her ex-husband but did not provide any additional details about the order. That statement pertained to an element of the offense for which he was charged, and the existence of the protective order was important to the State's case. However, the State did not rely on this statement to establish the existence of the protective order; on the contrary, the protective order was admitted into evidence during the trial, and one of the officers involved in the investigation in this case extensively testified without objection about the details of the protective order, including its requirements. *See Sandone v. State*, 394 S.W.3d 788, 794 (Tex.

35

App.—Fort Worth 2013, no pet.) (concluding under Rule 44.2(a) analysis that any error was harmless beyond reasonable doubt because another witness "testified to the same facts without objection"); *Langham*, 331 S.W.3d at 91 (noting that admission of out-of-court statements was not harmful error under Rule 44.2(a), in part, because statements "were cumulative of other evidence").

Concerning the strength of the State's case, we note that for Estrada to be convicted as charged in this case, the State had to prove beyond a reasonable doubt that he violated the terms of a protective order twice during a period that was twelve months or less by intentionally or knowingly communicating with Loera or by failing to comply with geographical restrictions set out in the order. *See* Tex. Penal Code § 25.072; *see also id.* § 25.07 (listing culpable mental states as intentional or knowing). As set out above, the protective order was admitted into evidence. The order and the officer's testimony through which the order was admitted established that Estrada agreed to and electronically signed the order and that the order was effective from November 30, 2022, through November 30, 2024. *See McGregor v. State*, No. 05-02-00993-CR, 2003 WL 22456331, at *2 (Tex. App.—Dallas Oct. 30, 2003, pet. ref'd) (mem. op., not designated for publication) (noting that defendant's signing protective order helped to establish knowledge of protective order).

Regarding the first violation of the protective order, a police officer testified that he was on duty at the airport on April 7, 2023, when he was notified that two people named in a protective order were flying back from Cabo San Lucas. The officer located Loera and Estrada in the airport sitting next to one another and testified that they were communicating with each other. A photo of the pair from the officer's body camera was admitted into evidence. Although Loera informed the officer that she was planning to cancel the protective order, she did

36

not mention having filed any paperwork to do so. Additionally, the order included a warning written in capital letters indicating that no person, including a protected person, could give permission to ignore or violate any provision of the order. After the officer interacted with Loera, she left with Estrada. In her affidavit of non-prosecution prepared in February 2024, Loera admitted that there was an active protective order when she and Estrada went to Cabo San Lucas.

Concerning the second violation, Loera called 911 on July 2, 2023, and reported that Estrada was in her home. Over the next few weeks, Loera wrote to the investigating officer and said that she did not want to press charges anymore, denied that Estrada was present on the day in question, and asserted that she was on a hallucinogen at the time she called 911. In her affidavit of non-prosecution, Loera asserted that her claim to the 911 dispatcher that Estrada had assaulted her was not true; however, she admitted that she and Estrada were at a pool party on July 2 at her condo complex, that they got into an argument, and that he "left the party and the apartment." The medical records prepared by the paramedic also reflected that Estrada came to her condo on July 2 and assaulted her. Neighbor testified at trial that she saw Estrada at the complex on July 2 when he came to the pool looking for his keys. *See McClenton v. State*, 167 S.W.3d 86, 96 (Tex. App.—Waco 2005, no pet.) (noting that "the State overall had a strong case" when determining that defendant was not harmed by admission of evidence in violation of defendant's confrontation rights).

In light of the preceding, if it was error to admit the portion of the 911 recording chronicling events occurring after Estrada left Loera's home, we conclude beyond a reasonable doubt that the admission did not contribute to his conviction or punishment and, therefore,

conclude that any error was not harmful. *See* Tex. R. App. P. 44.2(a); *McClenton*, 167 S.W.3d at 96.

**Cumulative Harm**

In his third issue, Estrada repeats his assertions that the erroneous admissions of the 911 recording and the medical records were harmful errors. Further, he asserts that the cumulative effect of the errors should result in a reversal of his conviction even if the errors on their own would not.

However, we previously determined that Estrada did not preserve his complaint asserting that the admission of the medical records violated his confrontation rights or alternatively that the admission did not violate his confrontation rights, that the trial court did not abuse its discretion by admitting the medical records under Rule 803(4), and that the admission of at least the majority of the 911 recording did not violate his confrontation rights. Accordingly, those rulings by the trial court could not serve as a basis for finding cumulative harm. *See Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009) (explaining that non-errors do not, in their cumulative effect, cause harm); *Ruffins v. State*, 691 S.W.3d 166, 188-89 (Tex. App.—Austin 2024, no pet.) (determining there was no cumulative harm where trial court did not err in making its rulings and where defendant did not preserve one of his claims). Further, we found that the admission of the last portion of the 911 recording would not have harmed Estrada even if it were error. *See* Tex. R. App. P. 44.2. Having found no harm from at most a single potential error, we conclude that Estrada did not suffer cumulative harm. *See Moreno v. State*, No. 13-22-00267-CR, 2023 WL 4945083, at *5 (Tex. App.—Corpus Christi-Edinburg

38

Aug. 3, 2023, no pet.) (mem. op., not designated for publication) ("[A]s the name of the doctrine suggests, a single harmless error cannot rise to the level of cumulative harm.").

For these reasons, we overrule Estrada's first three issues on appeal.

**Challenge for Cause**

In his final issue, Estrada contends that the trial court erred by striking Juror 53.

The strike occurred after the parties had used their peremptory challenges and after other members of the panel had been struck for cause. The trial court took a brief recess after the parties made their peremptory strikes. When the trial court went back in session outside the presence of the jury panel, the trial court informed the parties that one of the individuals who had been chosen for the jury—Juror 53—asked the bailiff to identify the defendant during the break. After the bailiff pointed to Estrada, Juror 53 informed the bailiff that he knew Estrada. More specifically, Juror 53 informed the bailiff that Estrada had been a customer at Juror 53's store. The trial court asked the bailiff to bring Juror 53 inside the courtroom, and the following exchange occurred:

[Juror 53]: I have a -- it's a candle and herb shop on East 7th Street. Sell spiritual, mystical items. And I know he's been in there a couple of times.

[Trial Court]: Okay.

[Juror 53]: I just know him as a customer.

[Trial Court]: Is there anything about that that would influence how you serve as a juror?

[Juror 53]: No. It just feels kind of weird.

39

. . . .

[Juror 53]: It just feels a little strange.

[Trial Court]: Well, you can -- if it's going to be uncomfortable -- I mean, he's a customer of yours, and, you know, your decision could affect your business and your customers. Are you sure that won't be in the back of your mind?

[Juror 53]: Well, something is always going to be in the back of my mind.

[Trial Court]: Well, I know but it usually doesn't have an impact on our business. Right?

So does anybody else have any questions?

[Prosecutor]: How many times do you estimate that he's --

[Juror 53]: At least a couple.

[Prosecutor]: And you recognize him?

[Juror 53]: Yeah.

. . . .

[Estrada's attorney]: I have some questions. Let me ask you: Are you certain that he came in or do you think it's somebody that looks like him?

[Juror 53]: No. Certain.

[Estrada's attorney]: Did he come in by himself or with his wife?

[Juror 53]: By himself.

[Estrada's attorney]: And you think that occurred on two occasions?

[Juror 53]: Mm-hmm.

[Estrada's attorney]: Okay. When I asked you earlier if you knew anybody on either side, you didn't raise your hand.

[Juror 53]: I wasn't sure if he was the defendant, and I asked the bailiff if he was.

[Estrada's attorney]: Do y'all have any relationship other than those two times?

[Juror 53]: No, no.

[Estrada's attorney]: And is there any reason that you -- it might be weird, but is there any reason you couldn't be fair and impartial to him and the State in this case?

[Juror 53]: No.

[Estrada's attorney]: That's all I have, Judge.

[Trial Court]: Okay. Go ahead and take a seat.

(Prospective Juror 53 recessed)

[Prosecutor]: I -- there was enough hesitation there about that it's weird, and I don't know if when it comes down to it, he is going to -- first of all, I don't know if he is going to share anything with other jurors about that. I don't know if he is going to decide he really hesitates to convict on someone who you know is a customer. We would ask --

[Trial Court]: I mean, do you move to strike him?

[Prosecutor]: Yes, Your Honor, we do.

41

[Trial Court]: Here is -- do you object to the strike?

[Estrada's attorney]: Yes.  We think that he can be fair and impartial.

[Trial Court]: It would be different if this was before, but at this point, when the State has already exercised their peremptories, that was important information for everybody to know, and so I'm going to grant the strike for cause.

On appeal, Estrada notes that Juror 53 explained that Estrada had only been a customer twice and confirmed that he could be fair and impartial.  Further, he emphasizes that Juror 53 was not told that he must not harbor any bias for or against him after making the disclosure.  In light of the preceding, Estrada argues that "[t]here is no evidence that Juror 53 harbored any bias or prejudice that would substantially impair his ability to follow the court's instructions and apply the law" and, therefore, that "the trial court erred in striking [J]uror 53." *See* Tex. Code Crim. Proc. art. 35.16 (setting out reasons for why potential juror may be struck for cause).

In addition to arguing that the trial court erred by striking Juror 53 for cause, he asserts that its ruling also violated the statutes pertaining to peremptory challenges.  More specifically, he notes Juror 53 was struck after both sides had exercised their peremptory challenges and asserts that Juror 53 had, therefore, been selected to be on the jury.  *See id.* arts. 35.14 (defining peremptory challenge), .25 (allowing party making peremptory challenge to "strike the name of such juror from the list"), .26 (noting that once peremptory challenges have been made, first twelve names "shall be the jury").  Further, he urges that the trial court's ruling effectively gave the State an extra peremptory strike and deprived him of "a lawfully constituted jury" under "the Texas Code of Criminal Procedure and the Due Process Clause."  *See id.* art. 35.15 (setting out number of peremptory strikes for each side).

42

As an initial matter, we note that although Estrada asserts in his brief that striking Juror 53 violated the Due Process Clause, he made no due-process argument when the trial court struck Juror 53. Accordingly, he did not preserve that argument for appellate consideration. *See* Tex. R. App. P. 33.1; *see also Sandoval v. State*, 409 S.W.3d 259, 280 n.10 (Tex. App.—Austin 2013, no pet.) (noting that defendant did not argue to trial court that removal of juror "violated his right to due process" and, therefore, failed to preserve that claim for appeal).[5]

Turning to the statutory arguments, we note that as with his due-process claims, Estrada did not object to the exclusion of Juror 53 on the grounds that striking Juror 53 essentially provided the State with another peremptory challenge and did not comply with the statutory directive in article 35.26 that the "first twelve names on the [jury] lists that have not been stricken" "shall be the jury." *See* Tex. Code Crim. Proc. art. 35.26; *see also* Tex. R. App. P. 33.1 (setting out how to preserve issue for appellate consideration).[6] Instead, Estrada objected on the ground that Juror 53 could be fair and impartial, which bears upon whether a potential juror could be challenged for cause. *See* Tex. Code Crim. Proc. art. 35.16. Further, the trial

---

[5] We note that although "[c]onstitutional provisions," including the Due Process Clause, "bear on the selection of a jury for the trial of a criminal case," not every error in the selection of a jury is of a constitutional dimension. *Jones v. State*, 982 S.W.2d 386, 391 (Tex. Crim. App. 1998); *see also Shettel v. United States*, 113 F.2d 34, 36 (D.C. Cir. 1940) (explaining that "it does not follow" that rejection of allegedly unqualified person "for insufficient cause" would violate defendant's constitutional rights). Only in limited circumstances, such as when a juror is excused because of a general opposition to the death penalty in a death penalty case or because of the juror's "race, sex, or ethnicity," would the erroneous granting of the State's challenge for cause violate a defendant's constitutional rights. *Jones*, 982 S.W.2d at 391. No claim or showing concerning those limited circumstances was made in this case. *See id.*

[6] Because this case involves a juror being struck for cause, Estrada's reliance on *Goode v. State* is misplaced because that case concerned a situation in which the defendant was not allowed the full number of peremptory challenges in a death-penalty case. 740 S.W.2d 453, 459, 460 (Tex. Crim. App. 1987), *receded from in Qualley v. State*, 206 S.W.3d 624 (Tex. Crim. App. 2006).

court expressly stated that it was striking Juror 53 for cause. Accordingly, we will address Estrada's argument that the trial court erred by striking Juror 53 for cause.[7]

Appellate courts review a trial court's decision to grant a State's challenge for cause under an abuse-of-discretion standard. *Bigby v. State*, 892 S.W.2d 864, 882 (Tex. Crim. App. 1994). "Because the trial judge is in the best position to evaluate a potential juror's demeanor and responses, we review a trial court's ruling on a challenge for cause with considerable deference." *Hudson v. State*, 620 S.W.3d 726, 731 (Tex. Crim. App. 2021); *see Burks v. State*, 876 S.W.2d 877, 893 (Tex. Crim. App. 1994). "When a prospective juror's answers concerning his ability to follow the law are vacillating, equivocating, ambiguous, unclear, or contradictory, we accord particular deference to the trial court's decision." *Hudson*, 620 S.W.3d at 731. "In reviewing the court's ruling, we look at [the challenged member]'s entire voir dire examination to determine whether there is support for the court's ruling." *Bigby*, 892 S.W.2d at 882.

A veniremember is challengeable for cause if the member has a bias or prejudice against the defendant or the law on which the State or the defendant is entitled to rely. Tex. Code Crim. Proc. art. 35.16(a)(9), (b)(3), (c)(2); *see Hudson*, 620 S.W.3d at 731. "The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry

---

[7] To the extent that Estrada is suggesting in his brief that a violation of article 35.26 and the other statutes pertaining to peremptory challenges is "structural" error that may be addressed without having been preserved and requires a lesser amount of harm to warrant a reversal, we note that case law establishes that claims concerning alleged violations of these statutes must be preserved to be addressed, *see Holiday v. State*, 14 S.W.3d 784, 789 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd), and are subject to a harm analysis, *see Chaves v. State*, 630 S.W.3d 541, 547-48, 551 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (noting that "[t]he right to trial by jury encompasses a right to have the jury selected in substantial compliance with the applicable procedural statutes and rules" but that "[a] violation of article 35.26 does not per se constitute reversible error" and explaining that if article 35.26 is violated, there must be "sufficient harm to warrant reversal").

out his oath and follow instructions in accordance with the law." *Tracy v. State*, 597 S.W.3d 502, 512 (Tex. Crim. App. 2020). "But, before a potential juror may be excused on this basis, the law must be explained to him and he must be asked whether he can follow the law regardless of his personal views." *Hudson*, 620 S.W.3d at 731. "The challenger bears the burden of establishing that the challenge is proper." *Id.* "The challenger does not meet this burden until he has shown that the veniremember understood the law's requirements and could not overcome his prejudice well enough to follow the law." *Id.*

In this case, prior to Juror 53's disclosure, he only answered a few questions during voir dire. First, when asked by the State to indicate on a scale of one (less) to six (more) whether the panel members would be less or more likely to trust a witness who was a member of law enforcement, Juror 53 stated, "three." Next, when asked by Estrada's attorney if the panel's own personal definition of the term "beyond a reasonable doubt" comported with the definition used by the federal court, Juror 53 answered, "I agree." Later, Estrada's attorney asked a scaled question in which he asked whether the panel would consider Estrada's silence as evidence of guilt if Estrada did not testify, and Juror 53 responded, "four" out of five with five indicating strongly or fully disagree. When asked an individual question about how Juror 53 would decide if someone was credible, he answered, "by his demeanor in giving his testimony." Estrada's attorney posed another scaled question to the panel regarding how likely a police officer is to lie compared to other witnesses, and Juror 53 stated, "[t]hree," indicating that police officers were not more nor less likely to lie than any other witness. Finally, Estrada's attorney asked the panel members if they had ever been on a criminal jury before, and Juror 53 answered that he had served on a criminal jury about 25 years earlier, that the jury reached a verdict, and that he did not remember if the prior jury had to determine a punishment. Nothing in these exchanges

45

demonstrated a bias or prejudice against Estrada or the law that he or the State was entitled to rely on. *See id.* at 731.

Moreover, after informing the bailiff that he knew Estrada, Juror 53 explained that he had known Estrada only as a customer and that Estrada had been a customer only twice. *Cf. Little v. State*, 758 S.W.2d 551, 559 (Tex. Crim. App. 1988) (explaining that "[t]he law requires more than the existence of a casual acquaintance with the victim of a crime or the victim's family to make a prospective juror subject to a challenge for cause"). Although Juror 53 stated that it would feel "weird" and "strange" to be on the jury, he also related that there was nothing about his prior interactions with Estrada that would influence how he served as a juror and that there was no reason he could not be fair and impartial to Estrada and the State. *See Comeaux v. State*, 445 S.W.3d 745, 749 (Tex. Crim. App. 2014) ("A trial judge must excuse the juror if bias or prejudice would impair the juror's ability to carry out his oath and instructions in accordance with the law."). Moreover, prior to Juror 53's being struck, he was not informed about what the law requires as far as being unbiased and impartial, and the State did not show that Juror 53 understood the law but "still could not overcome his prejudice." *See id.*

Although we recognize that trial courts are the best suited to evaluate a potential juror's demeanor and responses, Juror 53's answers concerning his ability to follow the law were not equivocal, ambiguous, or unclear and demonstrated that he would be able to execute his duties fairly and without bias to either party. *See Hudson*, 620 S.W.3d at 731. Under these circumstances, we conclude that the trial court abused its discretion by granting the State's challenge for cause.

In light of the preceding, we must now determine whether the exclusion of Juror 53 harmed Estrada. When arguing that he was harmed, Estrada claims that he "was deprived of

a fair, balanced process" that resulted in "structural unfairness" because a jury not "lawfully impaneled under the rules" was chosen. He asserts that he "was given no opportunity to reshuffle [his] strikes or reconfigure [his] strategy in response" to Juror 53's being struck. Further, he contends that the trial court's exclusion of a qualified juror altered "the composition of the jury without affording the same opportunity to the defense."

Because the nature of the error is not constitutional, we apply the standard set out in Rule of Appellate Procedure 44.2(b). *See* Tex. R. App. P. 44.2(b); *see also Tasby v. State*, 111 S.W.3d 178, 182 (Tex. App.—Eastland 2003, no pet.) (noting that "misapplication" of article 35.16 "is not constitutional error"). Under that standard, the error must be disregarded unless it affected substantial rights. *See* Tex. R. App. P. 44.2(b). A defendant's substantial rights are affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

"[W]ithout a showing that the error resulted in the denial of a fair and impartial jury," Texas courts have consistently held "that there was no reversible error in cases in which the trial judge improperly granted a challenge for cause." *Gray v. State*, 233 S.W.3d 295, 298 (Tex. Crim. App. 2007). A "defendant's only substantial right is that the jurors who do serve [on the finally constituted petit jury] be qualified. The defendant's rights go to those who serve, not to those who are excused." *Id.* at 298-99 (quoting *Jones*, 982 S.W.2d at 393); *see also Tasby*, 111 S.W.3d at 182 ("There is no right to have a particular person on the jury."). "[I]n a non-constitutional error analysis, a venireperson's improper excusal requires reversal 'only if the record shows that the error deprived the defendant of a lawfully constituted jury.'" *Gray*, 233 S.W.3d at 299 (quoting *Jones*, 982 S.W.2d at 394). "And in the absence of such a showing,

'we presume that jurors are qualified[.]'" *Id.* at 301 (quoting *Ford v. State*, 73 S.W.3d 923, 925 (Tex. Crim. App. 2002) (plurality op.)).

Nothing in the record indicates that the trial court's ruling left any objectionable jurors on the panel. *See Tasby*, 111 S.W.3d at 182. Similarly, nothing in the record demonstrates that the jury selected was not lawfully constituted. *See id.* Accordingly, we presume that the jurors who served were qualified, *see Gray*, 233 S.W.3d at 299, and conclude that Estrada was not harmed by the trial court's ruling, *see Tasby*, 111 S.W.3d at 183.

For these reasons, we overrule Estrada's final issue on appeal.

## CONCLUSION

Having overruled all of Estrada's issues on appeal, we affirm the trial court's judgment of conviction.

_____

Karin Crump, Justice

Before Chief Justice Byrne, Justices Crump and Ellis

Affirmed

Filed:   April 17, 2026

Do Not Publish

48